# UNITED STATES DISTRICT COURT

**SEALED**

for the

Eastern District of California

**FILED**

| In the Matter of the Search of | ) | |
| | ) | Case No. |
| 10170 Patti Way | ) | MAR 2 8 2018 |
| Elk Grove, California | ) | |
| | ) | CLERK, U.S. DISTRICT COURT |
| | ) | EASTERN DISTRICT OF CALIFORNIA |
| | | BY      JD |
| | | DEPUTY CLERK |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

2:18 - SW - 0227     EFB

**SEE ATTACHMENT A-14, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1), 846, 856; | Conspiracy to Manufacture, Possess with Intent to Distribute, and Distribute Marijuana; |
| 18 U.S.C. §§ 1956, 1957 | Maintaining a Place for Manufacture and Distribution of Marijuana; Money Laundering. |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Jason Chin, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-28-2018

_____
*Judge's signature*

City and state:  Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT
JASON CHIN IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**

I, Jason Chin, being first duly sworn, hereby depose and state as follows:

## I.    Scope of Requested Search Warrants

1.    I make this affidavit in support of applications for search warrants of twenty-nine properties located in the greater Sacramento, California, area. The properties are identified as:

## II.    Places (Attachment A-1 through A-29)

a.    7627 Masters Street, Elk Grove, California, which is referred to hereafter as "Target Property 1" and is further described in Attachment A-1;

b.    16481 Fiddletown Road, Fiddletown, California, which is referred to hereafter as "Target Property 2" and is further described in Attachment A-2;

c.    19460 Fiddletown Road, Fiddletown, California, which is referred to hereafter as "Target Property 3" and is further described in Attachment A-3;

d.    2033 Bastona Drive, Elk Grove, California, which is referred to hereafter as "Target Property 4" and is further described in Attachment A-4;

e.    8613 Orison Court, Elk Grove, California, which is referred to hereafter as "Target Property 5" and is further described in Attachment A-5;

f.    4960 Francesca Street, Elk Grove, California, which is referred to hereafter as "Target Property 6" and is further described in Attachment A-6;

g.    5313 Kungsting Way, Elk Grove, California, which is referred to hereafter as "Target Property 7" and is further described in Attachment A-7;

h.    7625 Meadowstone Drive, Sacramento, California, which is referred to hereafter as "Target Property 8" and is further described in Attachment A-8;

i.    6426 Fuego Way, Elk Grove, California, which is referred to hereafter as "Target Property 9" and is further described in Attachment A-9;

j.    8885 Monterey Oaks Drive, Elk Grove, California, which is referred to hereafter as "Target Property 10" and is further described in Attachment A-10;

k.    8061 Maybelline Way, Sacramento, California, which is referred to hereafter as "Target Property 11" and is further described in Attachment A-11;

l.    9445 Medstead Way, Elk Grove, California, which is referred to hereafter as "Target Property 12" and is further described in Attachment A-12;

m.    7960 Tierra Glen Way, Sacramento, California, which is referred to hereafter as "Target Property 13" and is further described in Attachment A-13;

n.    10170 Patti Way, Elk Grove, California, which is referred to hereafter as "Target Property 14" and is further described in Attachment A-14;

o.    8744 Vytina Drive, Elk Grove, California, which is referred to hereafter as "Target Property 15" and is further described in Attachment A-15;

p.    9043 Pembridge Drive, Elk Grove, California, which is referred to hereafter as "Target Property 16" and is further described in Attachment A-16;

1

q. 7661 Fey Way, Elk Grove, California, which is referred to hereafter as "Target Property 17" and is further described in Attachment A-17;

r. 4713 Laguna West Way, Elk Grove, California, which is referred to hereafter as "Target Property 18" and is further described in Attachment A-18;

s. 3975 Deer Cross Way, Sacramento, California, which is referred to hereafter as "Target Property 19" and is further described in Attachment A-19;

t. 5420 Acme Avenue, Sacramento, California, which is referred to hereafter as "Target Property 20" and is further described in Attachment A-20;

u. 8139 Valley Green Drive, Sacramento, California, which is referred to hereafter as "Target Property 21" and is further described in Attachment A-21;

v. 6439 Valley Hi Drive, Sacramento, California, which is referred to hereafter as "Target Property 22" and is further described in Attachment A-22;

w. 9009 Fernway Court, Elk Grove, California, which is referred to hereafter as "Target Property 23" and is further described in Attachment A-23;

x. 9543 Tarbert Drive, Elk Grove, California, which is referred to hereafter as "Target Property 24" and is further described in Attachment A-24;

y. 8620 Port Haywood Way, Sacramento, California, which is referred to hereafter as "Target Property 25" and is further described in Attachment A-25;

z. 5759 Muskingham Way, Sacramento, California, which is referred to hereafter as "Target Property 26" and is further described in Attachment A-26;

aa. 4630 Country Scene Way, Sacramento, California, which is referred to hereafter as "Target Property 27" and is further described in Attachment A-27;

bb. 25 Donson Court, Elk Grove, California, which is referred to hereafter as "Target Property 28" and is further described in Attachment A-28; and

cc. 1165 Quail Oaks Road, Valley Springs, California, which is referred to hereafter as "Target Property 29" and is further described in Attachment A-29.

2.     These properties, described in more detail in Attachments A-1 through A-29, attached hereto and incorporated herein by reference, are referred to herein collectively as the "Target Properties."

3.     The Target Properties are believed to be connected to a broader scheme to purchase residential homes in the Sacramento region for use as indoor marijuana grows using common financing, often wires from Fujian Province, China; employing certain hard-money lenders rather than traditional lenders with more favorable economic terms; utilizing specific realtors; and sharing other common traits and methodologies, as described below. I request search warrants for each property to establish further evidence of their commonalities and to uncover more information regarding the individuals and groups operating the Target Properties as marijuana grows.

4.     This affidavit is one of three being submitted concurrently as a part of a joint federal investigation into the scheme described above by four federal agencies (the Drug Enforcement Administration, Department of Homeland Security – Investigations, Federal Bureau of Investigation, and Internal Revenue Service – Criminal Investigations). These four agencies,

comprising the investigative team, have worked together on this investigation since approximately November 2017, as described further below.

5.  Because this affidavit is being submitted for the limited purpose of securing search warrants for the Target Properties, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (a)(1) (Manufacture of Marijuana), 846 (Conspiracy to Manufacture Marijuana), 856 (Maintaining a Place for the Manufacture and Distribution of Marijuana), 18 U.S.C. §§ 1956 (Money Laundering), and 1957 (Monetary Transaction in excess of $10,000 in Specified Unlawful Activity proceeds) will be found at the locations to be searched.

## III.    Relevant Statutes

6.  Pursuant to Title 21, U.S.C. § 841(a)(1), it is unlawful for any person knowingly or intentionally to manufacture, distribute or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. Pursuant to Title 21, U.S.C. § 846, it is unlawful to conspire to commit a violation of Title 21, U.S.C. § 841(a)(1). Both of these violations are felonies punishable by more than one year's imprisonment.

7.  Pursuant to Title 21, U.S.C. § 856, it is unlawful to knowingly open, lease, rent, use or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance. It is also unlawful to manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of manufacturing, storing, distributing, or using a controlled substance. This violation is a felony punishable by more than one year's imprisonment.

8.  Pursuant to Title 21, U.S.C. § 881(a)(7), all real property, including any right, title and interest in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used in any manner or part, to commit, or to facilitate the commission of a violation of Title 21 which is punishable by more than one year's imprisonment, is subject to forfeiture to the United States.

9.  Pursuant to Title 18, U.S.C. § 1956(a)(2)(A), whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place outside of the United States to or through a place inside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. Under Title 18, U.S.C. § 1956(h), it is a crime to conspire to commit a violation of Title 18, U.S.C. § 1956(a)(2)(A).

10. Pursuant to Title 18, U.S.C. § 1957, whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity shall be subject to imprisonment up to ten years.

11.  Pursuant to Title 18, U.S.C. § 981(a)(1), any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of Title 18, United States Code, or any property traceable to such property, is subject to forfeiture to the United States.

## IV.    Training and Experience

12.  I am a Special Agent of the Drug Enforcement Administration (DEA) and have been so employed since May 2005.  I am currently assigned to the DEA Sacramento District Office and am charged with investigating drug trafficking and money laundering activities in the Eastern District of California, and elsewhere.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations and make arrests for federal felony offenses.  I was trained as a DEA Special Agent at the DEA Academy, Quantico, Virginia.  During my training, I received special training in the Controlled Substance Act, Title 21 United States Code, including but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively.  I have received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute methamphetamine, cocaine, cocaine base, heroin, marijuana, MDMA, and other dangerous drugs prohibited by law.  I received further training in search and seizure law, financial investigations and money laundering techniques, and many other facets of drug law enforcement.  As a DEA agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug and money laundering statutes.

## A.    Background on Investigating Marijuana Trafficking and Manufacturing

13.  I have personally been involved in, and consulted with other experienced law enforcement agents about, several investigations targeting drug trafficking organizations who are cultivating marijuana in residential properties in the Sacramento, California area.  These residential properties are typically converted into full-scale indoor marijuana gardens that pose serious hazardous conditions to the occupants of the residences as well as nearby properties and residents.  It is common for marijuana cultivators to conduct the loading and unloading of marijuana and cultivation equipment inside closed garages in order to conceal their illegal activity.  I am aware furthermore that marijuana cultivators commonly use large industrial type ventilation systems in their marijuana gardens that consist of large conical carbon air filters, high-power industrial type electrical fans, large ducting, other equipment for the purpose of providing fresh air for the marijuana plants and to ventilate the marijuana odor to lessen the risk of being detected and discovered by authorities.  Although a typical marijuana grow house has all the windows tightly closed, these ventilations systems require an open window during the times of their operation in order to forcefully suck fresh air into the residence.  The open window(s) usually have visible debris stuck to the window screens.

14.  I know that, within the context of a marijuana investigation, marijuana grows inside residences can be identified by odd power usage patterns such as: (a) unusual usage that is meant to mimic a day/night cycle to promote growth in plants; (b) extremely low or extremely high usage in the absence of a reasonable explanation; (c) low gas usage consistent with an

unoccupied residence even though power is being consumed at the same residence; this suggests that cultivation equipment is running at all hours of the day.

15. Based on my training and experience, including my participation in this and other investigations involving financial crimes and the distribution of illicit drugs, and based upon my consultation with other experienced law enforcement agents and officers, I also know that:

16. Drug traffickers often possess, manufacture, and/or store illegal drugs, including marijuana, in their residences, stash-houses, or businesses – to include garages, barns, sheds, and other outbuildings – where they are concealed from law enforcement officials and readily at hand. Drug traffickers also often use their personal vehicles to temporarily store and transport illegal drugs. Furthermore, it is common for drug traffickers to maintain hidden compartments, items altered for the purpose of hiding or concealing drugs, and items purchased and converted for the use of storing their drugs in these same locations.

17. Unlike some illegal drugs, which originate overseas and require little or no domestic manufacturing, marijuana is often grown and processed in the United States. Manufacturing marijuana involves typical gardening supplies and equipment, such as soil, fertilizer, nutrients, nursery pots, and trimming shears, as well as more specialized supplies and equipment, such as high intensity lights, ballast, fans, filters, generators, PVC pipes, growing trays, and reservoirs. It is common for drug traffickers to maintain such equipment and supplies in their residences, stash-houses, or businesses where they are concealed from law enforcement officials and where they may be easily utilized.

18. Illegal drugs, including marijuana, are frequently transported into the United States and between cities within the United States in bulk, high-purity form, and drug traffickers attempt to mask the distinct odors of particular drugs during such transport through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease. Furthermore, illicit drugs are often repackaged in smaller quantities so they can be sold for a higher profit margin. This typically requires masking agents, scales, tape, heat-sealers and heat-sealed bags, zip-loc bags, turkey bags, paper or plastic bindles, gel capsules, and/or other materials and containers which are used for redistribution. These packaging supplies and equipment are oftentimes maintained by drug traffickers in their residences, stash-houses, or businesses, where they are concealed from law enforcement officials and where they may be easily utilized.

19. It is common for drug traffickers to maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their drug distribution activities in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the remittance of drug proceeds. Moreover, because drug traffickers will often "front" (that is, sell on consignment) controlled substances to their clients or will be "fronted" (that is, buy on credit) controlled substances from their suppliers, such documentation is necessary to keep track of the amount of drugs bought and sold and the amount of money paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer software programs. Such records, which are frequently cryptic or encoded in

5

order to protect those who are involved in the distribution activities, will often be maintained by drug traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so they are close at hand and readily available for the purposes of ascertaining current balances.

20. Drug traffickers frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these records are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of telephones, pagers, computers, and/or personal digital assistants such as i-Phones, Palm, and Blackberry devices.

21. Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship illegal drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written air bills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash-houses, businesses, and/or in their vehicles, where they are available for reference.

22. Drug traffickers commonly store their illicit drug inventory and any drug-use paraphernalia, to include pipes, syringes, and rolling papers, in their residences, stash-houses, businesses, and/or vehicles in order that they may have ready access to the drugs and/or paraphernalia in order to conduct their drug trafficking business or to use those drugs personally, and so that such items are concealed from law enforcement officials.

23. During the course of a search, law enforcement often seize articles of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises and/or vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys. In past instances in the course of investigating this Organization, items such as power receipts and other evidence of marijuana cultivation have been recovered specifically from vehicles.

24. Those involved in the distribution of illicit drugs often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport

drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers in their residences, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference.

25. Drug traffickers frequently utilize cellular telephones, satellite telephones, pagers and text-messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as I-Phones, Palm, and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these items, along with corresponding purchase, service, and billing records, are often maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are readily available. Further, drug traffickers often utilize two-way radios, police scanners, video surveillance systems, and other counter-surveillance equipment to prevent detection by law enforcement, and such items are typically maintained at their residences, stash-houses, businesses, and/or in their vehicles.

26. Drug traffickers frequently possess firearms, ammunition, magazines, holsters, silencers, receipts for the purchase of repair of firearms, carrying cases and firearm boxes, explosives, incendiary devices, and other dangerous weapons, to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are oftentimes stolen or otherwise possessed illegally, are typically maintained on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

27. Drug traffickers frequently take, or cause to be taken, photographs and/or videos (which may be stored as CDs or DVDs or other electronic media) of themselves, their criminal associates, their assets (including real and personal property), their weapons, and their drugs, and such items are typically maintained on their persons, in their residences, businesses, and/or vehicles.

28. Finally, I know from training and experience, as well as from other experienced investigators who have searched indoor residential marijuana grows in the past, that houses that have recently hosted residential marijuana growing operations, but no longer do, nevertheless often contain items or indicators of evidentiary value. Some of these indicators include significant molding and staining consistent with large scale indoor residential agricultural operations, fresh paint and/or new carpeting, patches in the ceiling sheetrock that are indicative of grow lights being formerly hung, abandoned or leftover equipment or tools, documentation and indicia regarding previous tenants or owners, and markings or indications of barricading or heightened security rare for a residential home. Recovering or documenting one or more of these indicators can assist law enforcement in confirming that the house was used as part of a larger drug manufacturing and trafficking operation, and often can produce additional leads regarding individuals of interest who may have purchased or rented a subsequent home worth investigating.

**B.      Background on Money Laundering in Relation to Drug Trafficking**

29.   Illegal drugs, including marijuana, are typically bought and sold in exchange for cash, and it is common for drug traffickers to conceal large sums of currency, precious metals, jewelry, wire transfer receipts, cashier checks, money orders and receipts, and other financial instruments or items of value which either represent the proceeds from drug sales or are intended for the purchase of controlled substances, including documentation relating to the purchase of real estate, businesses, and motor vehicles.  When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  Collectively, the methods used by drug traffickers to conceal the source of and utilize their illicit income are called money laundering.  For example, money laundering methods include using the proceeds from the illicit activity in order to conduct cash transactions in amounts less than $10,000.01 with the purpose of avoiding currency reporting requirements or in order to purchase items which, in turn, are used to promote the ongoing illicit activity. Money launderers also oftentimes utilize businesses as "fronts" in an attempt to legitimize and conceal their activities, and use aliases and nominees to conceal assets and financial activity.

30.   In the course of laundering their illicit proceeds, drug traffickers often utilize foreign and domestic banks and their attendant services, to include savings and checking accounts, securities, cashier's checks, money drafts, letters of credit, safe deposit boxes, and the purchase of real estate or vehicles; other financial services or money services businesses, to include insurance and investment companies, the United States Postal Service, and money remitting services; and business services for the establishment of shell corporations, business fronts, and post office boxes.  They typically keep records of such activity, including accounting books, records, receipts, bank statements and records (of both domestic and foreign banks), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank checks, letters of credit, and tax returns for long periods of time.

31.   Also, drug traffickers often utilize fictitious or "strawholder" owners to conceal the true ownership and illegal source of real property, vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  In addition, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances or make remittance for other costs relating to the distribution of illicit drugs or in their efforts to launder the proceeds from such activities.  The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, the trafficking of controlled substances.

32.   Those involved in the distribution of drugs typically maintain currency and money counters, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments, as well as records or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth in connection with drug trafficking on their persons or in their residences, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.

33.   Furthermore, I know that it is common for drug traffickers to hide drugs, currency and other valuable items representing the proceeds of drug sales or intended for use to purchase drugs, and/or records of drug transactions, drug sources, and drug customers in secure locations

within their residences, stash-houses, businesses, and/or vehicles in order to prevent the theft of such items by other persons or the seizure of such items by law enforcement. These secure locations typically include safes, portable safes, vaults, or other locked containers, as well as specially-constructed concealed compartments such as those often found in "load cars" used specifically to facilitate drug trafficking. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, detached garages and other out-buildings, sheds, and/or exterior closets, the use of specially-constructed or natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines.

34. And finally, I know from my training and experience that those involved in ongoing, long-term conspiracies to distribute illegal drugs often maintain the types of items described above in their residences, stash-houses, businesses, and/or in their vehicles on an ongoing, long-term basis so as to facilitate the conspiracy and prevent detection.

35. Persons involved in money laundering in particular also oftentimes maintain records of their financial activity, such as receipts for expenditures by cash and check and other financial instruments, business records, bank records, tax returns, escrow files and other financial documents, in their personal residences, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, invoices, bank records, tax documents and other records. Records of this kind are also often stored on computer media. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accountants to complete financial statements and tax returns for their business and personal tax returns.

36. Persons engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience, where there is a long-term or ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity has ceased (e.g., financial records), the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale. There are many reasons why persons maintain evidence for long periods of time. For example, the evidence may be necessary business records which must be kept for information reporting purposes, such as for state and Federal tax returns, loan applications, to produce profit-and-loss statements and balance sheets and for "parent" company reporting. The evidence may also be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials) but have significance and relevance when considered in light of other evidence. The offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, which in fact may be retrievable by a trained forensic computer expert. Furthermore, the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped. Thus, records reflecting income and expenditures for the time period spanning the

9

activity and those years immediately following the end of this activity are essential to any financial investigation.

## V.      Basis for Facts and Circumstances

37. The conclusions and opinions set forth below are based on my experience and training as a special agent, my direct participation in this investigation as described below, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation. Throughout this affidavit, all sentences that begin with the words "I believe" are based upon this combination.

38. As detailed below, the probable cause supporting the issuance of these search warrants is based on an extensive multi-year investigation that included the review of utility and real estate transaction records, bank records, physical, electronic, and video surveillance, reports and information from other law enforcement investigations, consultations with Sacramento Municipal Utility District (SMUD) and Pacific Gas & Electric (PG&E) representatives, telephone toll analysis and evidence obtained from previously executed search warrants. I believe the probable cause outlined in this affidavit will show that there is a fair probability that the locations detailed in Attachments A-1 through A-29 will contain evidence and items detailed in Attachment B for the above-noted search warrant locations.

## VI.     Facts and Circumstances Establishing Probable Cause

### A.      Investigating the Organization and Linked Properties

39. In August 2014, the DEA Sacramento District Office initiated a federal investigation of a criminal organization that was believed to be responsible for the cultivation and distribution of marijuana on a large scale (herein, the "Organization"). The Organization was believed to be purchasing homes in the Sacramento region using money from China, converting these residences into indoor marijuana cultivation sites, and then trafficking the processed marijuana to other parts of the country, particularly the Eastern United States. The Elk Grove Police Department ("EGPD") was also investigating the same suspected Organization. As part of the federal investigation, on September 14, 2016, the DEA and IRS-CI, assisted by officers from EGPD and the Sacramento County Sheriff's Department (SCSD), executed seven federal search warrants on residences associated with this indoor marijuana growing operation, and arrested Leonard YANG and several other individuals pursuant to Title 21 federal drug violations. In total, agents seized approximately 5,496 marijuana plants from the seven residences which were all converted into full-scale indoor marijuana grows.

40. At approximately the same time as the Sacramento DEA drug trafficking investigation was commenced, a parallel financial investigation pertaining to how the residences used for cultivation were purchased was initiated by Internal Revenue Service, Criminal Investigation (IRS). Both the DEA drug trafficking and the IRS financial investigation have continued to date.

41. During the continuing federal investigation, it was learned that Xiu Ping LI, an investor in Leonard YANG's marijuana growing operation, had also purchased several homes

10

herself, either in her name or in the names of several of her relatives.  It was further learned that individuals who had provided funds for some of the homes bought by Xiu Ping LI had also purchased additional homes to grow marijuana.  On July 26, 2017, federal search warrants were executed at nine residences in the Sacramento and Roseville, CA areas, with the assistance of local law enforcement agents, and more than approximately 7,000 marijuana plants were found and seized.  Xiu Ping LI, among several other individuals, was arrested and charged with federal controlled substance and money laundering violations.

42.  In June 2017, while federal agents were investigating the Xiu Ping LI organization, they learned of an investigation conducted by the Yuba County Sheriff's Department earlier in 2017 (hereinafter referred to as the "2017 Yuba County Investigation").  In January 2017, Yuba County law enforcement officials began investigating a large-scale marijuana cultivation and trafficking organization operating in Northern California, specifically, in the Marysville, Sacramento, and Wilton, CA areas.  In March 2017, law enforcement officials executed search warrants at nine houses in these areas, arrested an individual identified as Zhen Shang LIN, among others, and seized approximately 6,493 marijuana plants.  On July 6, 2017, based on surveillance conducted during the Xiu Ping LI investigation, it was determined that the organized marijuana grow activity in residential areas identified in the 2017 Yuba County Investigation was directly linked to the federal Xiu Ping LI investigation by the presence of a vehicle registered to Zhen Shang LIN at one of the grow houses later searched by agents on July 26, 2017.

43.  As the investigation has developed, agents have observed a number of common links between properties being used as indoor marijuana grows and suspected to be part of the Organization's operations or related individuals' and groups' criminal conduct.  These links included down payments financed by wires mainly from Fujian Province, in China; the use of one of a handful of common realtors, namely Heidi PHONG and Tony DONG; the involvement of hard-money lenders, namely Petaluma-based FJM Private Mortgage Fund, LLC, rather than traditional banks, in purchasing the homes; and the structure and terms of the purchase itself.  In turn, the homes often possessed other common characteristics after being purchased, such as high power usage, and association with certain individuals, that marked them as marijuana grow houses rather than primarily residences.

44.  As the size and scale of the residential home-buying and marijuana cultivation efforts sharing these common unique features have become clearer, in approximately November 2017, the investigative team expanded beyond DEA and IRS-CI to include the Department of Homeland Security (HSI) and Federal Bureau of Investigation (FBI).  HSI and FBI joined the ongoing efforts of DEA and IRS-CI at investigating the Organization and related individuals or groups associated with properties bearing the links described above.

45.  Since August 2014, the DEA has served dozens of search warrants and arrested at least 18 people for cultivating and distributing marijuana in cases related to this investigation and the Organization.

46.  As of today, the investigation has identified in excess of one hundred homes in the Sacramento region that share some or all of the links that tied previously-searched homes to the Organization and to marijuana cultivation in residential neighborhoods.  This affidavit seeks

search warrants for a set of those properties in order to obtain additional evidence and links between the properties. I believe that there is probable cause to believe that the Target Properties are being used as indoor marijuana grows, and the links described generally above and detailed more fully below indicate some likelihood that many, if not all, of the Target Properties are involved in a large-scale common criminal enterprise.

47. Finally, the properties identified by this investigation to date, which are located in residential neighborhoods, have been tied to a significant influx of criminal activity in addition to the manufacturing of controlled substances. In particular, law enforcement from Sacramento and surrounding areas have reported an increase in violent crime attributable to the expansion of indoor marijuana grows in residential areas. As a result, this investigation has drawn on the resources of multiple federal agencies to attempt to remove the source of increased criminal activity from residential areas of the Sacramento region.

### B.     The Organization's Means and Methods and the Target Properties' Similar Characteristics

48. The investigative steps described above have established that scores of residential homes in the Sacramento region, including the Target Properties, were acquired using certain common means and methods, which may tie them to a single common criminal enterprise—either that of the Organization or related groups. These common means include how the residential homes used for cultivating marijuana are purchased and financed, and the personnel and entities involved in such purchases. In turn, the investigation has uncovered common traits of the homes, including the Target Properties, that, post-acquisition, evidence conversion to indoor marijuana growing.

49. *The Home Purchases.* First, funding for the home purchases examined in this investigation follows a similar pattern and is structured in a common manner across multiple transactions. For example, the escrow and/or loan files pertaining to the purchases of the homes involved in the Leonard YANG, Xiu Ping LI and 2017 Yuba County Investigation were reviewed as part of this investigation. In general, the purchases of all of these confirmed marijuana grows followed the following similar pattern: the buyer of the property generally put $5,000 to $10,000 down as an Earnest Money Deposit (EMD), usually through a domestic wire transfer, a personal check, or a cashier's check. Subsequently, additional domestic wire transfers or cashier's checks, often from multiple individuals not listed as co-buyers on any of the documents, were deposited into escrow. The domestic source bank accounts were then reviewed and reveal that in a large majority of the houses searched to date and confirmed to be marijuana grows, at least a portion of the down payment was traced back to wire transfers from China, and more specifically from the Fujian Province. These wire transfers often totaled just under $50,000 each, which your affiant understands to be the legal limit per person, per year for outbound money transfers from China. In addition, almost all of the homes were purchased as "residential rentals."

50. Moreover, the home purchases examined to date for houses that have been confirmed as marijuana grows through past searches followed similar financing models. On every occasion, the buyers put down at least 40–50% of the cost of the home, and then obtained financing from a "hard-money" lender for the balance of the purchase price, at substantially

higher interest rates and fees than the current conventional loan market offers. This financing generally took the form of a two- or three-year, 9–10% interest-only note that had to be paid in full at the end of the two- or three-year period.

51.  The hard-money lenders used most often were identified as Petaluma-based FJM Private Mortgage Fund, LLC (and its subsidiaries Northern California Mortgage Fund IX, LLC, Northern California Mortgage Fund X, LLC and Northern California Mortgage Fund XI, LLC), as well as Lone Oak Fund, LLC, a hard-money lender in the Los Angeles area. Other hard-money lenders included Socotra Fund (located in Sacramento, CA), Granite Funding (located in Rancho Cordova, CA), and Red Tower Capital (located in the San Francisco Bay Area).

52.  Moreover, based on information obtained during this investigation, investigators have learned that "hard-money" loans to purchase residential real estate are more suited for individuals who are in the business of buying distressed properties (*i.e.* at foreclosures, government sales, etc.), rehabilitating them, and then selling them for a profit after a relatively short period of time, also known as "flipping." Investigators have further learned that it is generally not beneficial for individuals to use hard-money lending to "buy and hold" property as residential rentals due to the high fees (generally 3% of the loan amount) and high interest rates.

53.  It is your affiant's belief that the large down payments and the use of "hard-money" lenders (instead of conventional bank financing with substantially lower interest rates) were done so that the buyer(s) would not have to substantiate their income and/or their ability to repay the loan. For example, Stewart Title escrow records and loan records for the purchase of 9501 Jeffcott by Leonard YANG established that the property was purchased in March 2016 for $735,000, with a down payment of approximately $398,500, and financing from hard-money lender FJM Private Mortgage Fund, LLC, in the amount of $346,702.92. The down payment consisted of domestic wire transfers into escrow from bank accounts of the purchaser and several other individuals. A review of the accounts from where these wire transfers originated revealed that some of the wires into escrow were funded by wire transfers from China made to the source account only days before. This house was confirmed to be a marijuana grow on September 14, 2016, when 2,017 plants were seized from the property. The same general financing pattern is shared by all of the confirmed marijuana grows in residential homes uncovered in this investigation.

a.  In another example from DEA's investigation, approximately $89,460 in wire transfers from China were used by Leonard YANG to finance the purchase of 6340 Logan Street for $209,000 on or about September 27, 2015. In turn, 857 marijuana plants were found during execution of a search warrant at this property on September 14, 2016.

b.  In another example from DEA's investigation, approximately $99,970 in wire transfers from China were used by Leonard YANG to finance the purchase of 1735 Itasca Avenue for $365,000 in January 2016. During a search warrant at this property on September 14, 2016, law enforcement found 721 marijuana plants.

c.      Finally, escrow records showed that Xiu Ping Li received $97,970 in wire transfers from China for the $325,000 purchase of 7810 Elsie Avenue on or about January 14, 2016. On July 26, 2017, agents found in excess of 1,000 marijuana plants in 7810 Elsie Avenue.

54. *Realtor.*      Many of the past residential home purchases identified in this investigation as associated with the Organization and used for marijuana grows have been transacted by the same small group of realtors, as follows.

a.      Heidi PHONG.  In the Leonard YANG investigation, it was discovered that all five of the confirmed marijuana grow houses purchased by YANG and the suspected straw buyers he utilized were completed with the assistance of realtor Heidi PHONG. Furthermore, the first house YANG purchased (6340 Logan Street) was actually bought from PHONG Enterprises, LLC, a Heidi PHONG entity.  Moreover, a search of Leonard YANG's mobile phone was conducted after his arrest in September 2016.  The search revealed text messages between YANG, PHONG, and others, on an application called WeChat.  Based on the text messages, which included discussion of electrical amperage of homes PHONG was trying to find for YANG, as well as a link to a local news website article regarding marijuana being grown in warehouses, it is apparent that Heidi PHONG knew Leonard YANG was a marijuana grower no later than April 2016.

b.      The WeChat texts further indicated that Zhong Yan YANG became a client of Heidi PHONG at some point in the summer of 2016, for the purpose of purchasing a residence to grow marijuana.  Using wire transfers from China for the down payment, and financing from a hard money lender for the balance, Zhong Yan YANG purchased real property located at 6480 Marysville Road, Browns Valley, CA (Yuba County) in September 2016 with Heidi PHONG's assistance.   Shortly after the purchase, PG&E records reflected a significant increase in the power usage at the property. On January 24, 2018, the Yuba County Sheriff's Department executed a search warrant at 6480 Marysville Road and found approximately 1,943 marijuana plants.

c.      Moreover, in the Xiu Ping LI investigation, it was discovered that Heidi PHONG represented LI in the purchase of real property located at 7810 Elsie Avenue, Sacramento CA in January 2016.  This property was search on July 26, 2017 and in excess of 1,000 marijuana plants were found.

d.      On July 17, 2017, a federal search warrant (2:17-SW-0632-CKD) was approved by the Honorable U.S. Magistrate Judge Carolyn K. Delaney, for Gmail accounts associated with Heidi PHONG (heidiphong@gmail.com and tchpteam@gmail.com).

e.      During the 2017 Yuba County Investigation, a home located at 9700 Clay Station Road, Wilton, CA, owned by Zhen Shang LIN, was searched. Pursuant to the search, officers found approximately 832 marijuana plants. Escrow documents for the purchase of this residence, as well as emails reviewed pursuant to the Heidi PHONG Gmail search warrant revealed that Heidi PHONG, believed

14

to be working under Davis Berk Realty at the time, was the agent who represented LIN in the purchase of the property. Furthermore, the escrow records reflected that SKYE, LLC, another Heidi PHONG entity, provided $99,708.28 to LIN for the purchase of the property. Additional emails from the Gmail search warrant revealed that after the search warrant was executed at 9700 Clay Station Road in March 2017, Zhen Sheng LIN sold the property, and Heidi PHONG represented him in the sale.

        f.     Two other properties in the 2017 Yuba County Investigation associated with Zhen Shang LIN included 7709 South Parkway, Sacramento, CA (where approximately 450 marijuana plants were found) and 5656 Shires Way, Marysville, CA (where approximately 449 marijuana plants, a Del-Ton .223 AR rifle and ammunition, as well as a Beretta .380 caliber pistol were found). Moreover, Zhen Shang LIN and his wife, Li Juan WANG were found inside of 5656 Shires Way.

        g.     Pursuant to the Gmail search warrant, agents found an email, dated April 6, 2017, from Heidi PHONG to "Tasks – HP Real Estate" which appears to be monitored by PHONG's assistant, Belle BALOLONG. The email, entitled "Urgent – need rental agreement – do not put my name on anything" directed BALOLONG to prepare two rental agreements for homes located at 7709 South Parkway, Sacramento, CA and 5656 Shires Way, Marysville, CA. The email further contained WeChat screenshots reflecting a conversation between Heidi PHONG and Li Juan WANG, which discussed the terms of the purported leases. Based on the texts and the associated emails, it is my belief that Li Juan WANG was fearful that the properties located at 7709 South Parkway and 5656 Shires Way would be seized by law enforcement, so she therefore asked Heidi PHONG to create false leases to allow the titled owners to exert an "innocent owner" defense to seizure and forfeiture of the properties. Further emails from the Gmail search warrant indicate that Heidi PHONG was the listing agent for both 7709 South Parkway and 5656 Shires Way when they were listed for sale in the summer of 2017.

        h.     <u>Tony DONG.</u> In addition to the involvement of Heidi PHONG, realtor Tony DONG was also one of the more prevalent realtors used by marijuana growers to purchase homes. In the Xiu Ping LI investigation, DONG represented LI or her associates in the following real property purchases:

        i.     13734 Montfort Road, Herald, CA purchased by XIU PING LI (where approximately 2,364 marijuana plants were found by the Sacramento County Sheriff's Department in October 2016);

        j.     8114 Suarez Way, Elk Grove, CA (where approximately 259 marijuana plants were found in July 2017); and

        k.      2860 Central Avenue, Roseville, CA (where approximately 1,406 marijuana plants were found in July 2017).

        l.      Moreover, DONG was the realtor for several of the homes purchased in Yuba County that were later found to contain marijuana grows during the 2017 Yuba County Investigation, including the following:

        m.      5694 Shires Way, Marysville, CA (where 1,295 marijuana plants were found in March 2017); and

        n.      2092 Moss Glen Loop, Marysville, CA (where a marijuana grow was in the process of being set up when discovered in March 2017).

55. *Use of Nominees to Conceal Criminal Activity.* Some residential homes identified in this investigation as associated with the Organization have nominee property owners that hide the true ownership of the property—distancing the Organization or true participants from the residential marijuana grow. The nominee owners listed as the record owner for residences connected to this investigation have followed a pattern: the person is related to those involved in the daily activity of the marijuana grow, earns insufficient income for a large home purchase, and did not contribute to the acquisition of the property.

        a.      One example of this nominee use is 8114 Suarez Way in Elk Grove, California, a residential home currently subject to criminal forfeiture in the Xiu Ping Li criminal case (Case No. 2:17-CR-00136-KJM). There, law enforcement searched 8114 Suarez Way and discovered the home had been converted to an indoor marijuana grow with 259 plants. Guangzhao LI was arrested at the property on the day of the search. Xiu Ping LI and Guangzhao LI were indicted on drug charges, as were Gui W. PAN, Dao Zhong WEI, and Yongie LIU, who, as explained below, provided some of the money used to purchase 8114 Suarez Way.

        b.      Escrow and bank files for the acquisition of 8114 Suarez Way show the property was purchased for approximately $416,000 in April 2017. Title records list the buyer as "Yan Bing Li," a 25-year old female who in 2016 worked for a Hibachi Buffet in Houston, Texas earning approximately $13,000. Records from U.S. Customs and Immigration identify Yan Bing LI as the daughter of Defendant Xiu Ru LI and niece of Defendants Xiu Ping LI and Guangzhao LI. This relationship was confirmed by Xiu Ping LI during a law enforcement interview. Yan Bing LI has a New York driver's license that reflects a residence in Corona, New York.

        c.      Approximately three payments totaling $175,700.00 went into escrow to purchase 8114 Suarez Way, broken down as follows:

| Date | Amount | Description |
|------|--------|-------------|
| 03/17/2017 | $5,000.00 | Personal check from Defendant Dao Zhong WEI's Wells Fargo Bank account, funded by cash and money order deposits. |
| 03/27/2017 | $70,700.00 | Wire transfer from Defendant Xiu Ping LI's Bank of America account, funded by escrow proceeds received by her from the sale of 13734 Montfort Road, Herald, CA, a marijuana grow site with over 2,000 marijuana plants when searched in October 2016. |
| 03/28/2017 | $100,000.00 | Wire Transfer from Yan Bing LI's Bank of America account, funded by a wire transfer from China of $48,944, cash deposits, and checks from Defendants Gui W. PAN ($8,000) and Yongjie LIU ($5,000). The $48,944.47 wire was from Agricultural Bank of China and the "Payment Detail" section of the wire identifies the funds as designated for "Travel." |

        d.     The balance of the purchase price was funded by hard-money lender FJM Private Mortgage, LLC. The loan application submitted to FJM—and signed by Yan Bing Li—identifies earnings of $5,500 per month from managing Flea-Mart Wine & Liquor in Brooklyn, New York, a position she has held for approximately 1½ years. Law enforcement subsequently seized a client copy of Yan Bing Li's 2016 Federal income tax return from a separate marijuana grow involved in the Li case, which revealed she exclusively worked at Houston Hibachi Grill & Buffet in Houston in 2016. Furthermore, Yan Bing LI's bank records reflect no payroll checks from Flea-Mart Wine & Liquor, but Yan Bing LI made an electronic payment on the mortgage for 8114 Suarez, Elk Grove, CA on May 8, 2017. However, the mortgage payment is traceable to a $2,500 cash deposit made in Sacramento on May 5, 2017.

     56.  *Power Usage.* In addition to the unique characteristics of how the homes identified in this investigation are purchased, the residential marijuana grow houses identified in this investigation maintain certain common operational features. First, the houses typically use a significantly higher amount of electricity per month than the same house did previous to being purchased for use as a suspected marijuana grow. As stated previously in this affidavit, such large residential power use is often a feature of marijuana cultivation, which, when done indoors, requires significant electricity to power high-voltage lighting, fans, and other necessary equipment. This power usage is established by records from SMUD or PG&E, and further tied to likely marijuana cultivation by the contrast between the monthly averages since the home was purchased and the significantly lower six-month average prior to that acquisition.

        a.     For example, with respect to Xiu Ping LI's property at 13734 Montfort Road (where 2,364 marijuana plants were found in October 2016), for the twenty months prior to Xiu PING LI purchasing the property, the power usage averaged approximately 486 KWH per month, and the average bill was approximately $69. After Xiu PING LI purchased 13734 Montfort Road, the power

usage shortly increased and averaged approximately 14,730 KWH per month (a 3,000% increase) through October 19, 2016, and the average bill was approximately $2,772 (nearly 4,000% higher).

   b.   Moreover, with respect to Xiu Ping LI's property at 7810 Elsie Avenue (where in excess of 1,000 marijuana plants were found in July 2017), power usage at the residence for fifteen months prior to Xiu Ping LI purchasing the residence averaged approximately 1,272 kWh per month, and the average bill was approximately $208. After Xiu Ping LI purchased the property, the power usage shortly thereafter increased and averaged approximately 9,996 KWH per month (nearly an 800% increase); further, the average bill was approximately $1,647 (also nearly 800% higher).

   c.   Another property involved in the Xiu Ping LI investigation was 2860 Central Avenue, Roseville, CA, which was bought in the name of Bi Yun LI. When this property was searched in July 2017, approximately 1,406 marijuana plants were found. PG&E provided power usage at the residence for the nine (9) months prior to Bi Yun LI purchasing the residence, as well as the four (4) months following her purchase. An analysis of the power usage revealed that for the nine months prior to Bi Yun LI purchasing 2860 Central Avenue, the power usage averaged approximately 885 KWH per month, and the average bill was approximately $226. The analysis further revealed that shortly after Bi Yun LI purchased the property, the power usage increased substantially and averaged approximately 6,303 KWH per month (over a 700% increase), and the average bill was approximately $2,422 (over 1000% higher).

   57. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage in the earlier investigations was similar. SMUD and PG&E records reflected that the payments made on the electric bills for the homes where marijuana grows were found were most frequently made in cash or money orders in the SMUD lobby, or through pay stations (such as those found at Raley's or similar locations). This is further indicative of marijuana trafficking due to the fact that it is a cash-intensive business.

   58. *Surveillance and Local Law Enforcement Actions.* In addition to the common characteristics tying properties to others identified to date as marijuana grows by the investigation, as well as traits identified that mark houses as likely engaged in marijuana cultivation, described above, law enforcement surveillance and local law enforcement actions provide further evidence, detailed below, that relate the Target Properties to one another and to marijuana manufacturing. For example, during surveillance of the residential properties in the previous investigation, it was common to observe security devices and signs installed at the properties including surveillance video cameras, security doors and gates, alarm company signs and beware of dog signs. Based on my training and experience and conversations with other law enforcement officers who have experience working indoor marijuana grows, I am aware that it is common for indoor marijuana growers to install security devices as a means to deter thefts and robberies of the marijuana grows.

## C.     *Target Properties to be Searched*

### Target Property 1 – 7627 Masters Street, Elk Grove, California

59.   Target Property 1 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

60.   *Escrow and Loan Files Show Same Pattern of Financing.*   Daniel Zhu purchased 7627 Masters Street, Elk Grove, California on or about 6/13/2014 for $339,000.  The following funds were deposited into escrow to make a 30% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 6/6/2014 | $10,000.00 | Wire transfer from Daniel Zhu's Bank of America account #XX9831, funded by East West Bank cashier's check #659003220 for $10,000.00, drawn on Daniel Zhu's East West Bank account #XX0576, deposited to BofA #XX9831 on 6/5/2014.  The East West Bank cashier's check was further funded by three wire transfers from China on 5/28/2014 ($49,989.00), 5/29/2014 ($47,989.00) and 6/2/2014 ($12,989.00) and cash deposits. |
| 6/12/2014 | $106,718.06 | Wire transfer from Daniel Zhu's East West Bank account #XX0576, funded by three wire transfers from China on 5/28/2014 ($49,989.00), 5/29/2014 ($47,989.00) and 6/2/2014 ($12,989.00) and cash deposits. |

a.      *Financing Model.*  The balance of the purchase price, $236,000.00, was financed through a three-year, 9% interest-only loan from "hard-money" lender TKV, LP, through Granite Funding.  Daniel Zhu paid $9,626.00 in fees and prepaid interest for this loan.  On the loan application he signed on 5/22/2014, Daniel Zhu indicated he lived at 31 Binnacle Lane, Quincy, MA, worked at Hong Kong Restaurant in Marshfield, Massachusetts and earned $43,200 per year.  According to a deed of trust filed with the Sacramento County Recorder, Zhu refinanced this loan with "hard money" lender RWA Trust for $250,000.00 on or about 8/28/2017.

61.   *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified the owner, Daniel Zhu, as the subscriber to electrical service at this property from June 17, 2014 to the present.  Power usage was not available from SMUD for the previous occupant prior to Zhu; however, invoice amounts were provided for the six months prior to Zhu's purchase of Target Property 1. According to the invoice data, the average monthly bill from January 2014 to the final invoice on June 18, 2014 was $147.63.  In contrast, Zhu's monthly invoices from June 2014 to January 2017 averaged over $1,400, which indicates a dramatic increase in power usage.  With respect to the power usage at Target Property 1, in 2015, the monthly power use averaged 9,938 KWH, which is indicative of a marijuana grow.  In 2016, the monthly power use averaged 8,630 KWH, which is further indicative of a marijuana grow.  The monthly figures for 2017 forward are as follows:

a.      Jan-2017:     9,292 KWH

19

b.     Feb-2017:     9,799 KWH
c.     Mar-2017:     9,438 KWH
d.     Apr-2017:     9,475 KWH
e.     May-2017:     9,864 KWH
f.     Jun-2017:     8,728 KWH
g.     Jul-2017:     8,495 KWH
h.     Aug-2017:     8,253 KWH
i.     Sep-2017:     9,514 KWH
j.     Oct-2017:      640 KWH
k.     Nov-2017:     3,821 KWH
l.     Dec-2017:     6,336 KWH
m.     Jan-2018:     6,797 KWH
n.     Feb-2018:     7,043 KWH

62. *Surveillance.* I conducted surveillance on this house on January 31, 2018. I observed a silver Honda Odyssey with California license plate 7ZHA382, registered to Daniel Jing Zhu, parked in the driveway of the residence. Additional surveillances were conducted on this house on February 28, 2018, and on March 5, 2018, by DEA. During these surveillances, a DEA surveillance agent observed a white Ford with California license plate 7RAH269, registered to Daniel Jing Zhu, and a silver Toyota with California license plate 6LFZ181, registered to Daniel Jing Zhu, parked in the driveway of the residence.

## Target Property 2 – 16481 Fiddletown Road, Fiddletown, California

63. Target Property 2 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

64. *Escrow and Loan Files Show Same Pattern of Financing.* Daniel Zhu purchased Target Property 2 (16481 Fiddletown Road, Fiddletown, California) on or about June 28, 2017 for $243,000.00. Zhu was also described above as the purchaser of Target Property 1. The following funds were deposited into escrow to make a 50% down payment:

| Date | Amount | Description |
| --- | --- | --- |
| 6/2/2017 | $10,000.00 | Wire transfer from Daniel Zhu's East West Bank account #XX0576, funded by approximately 24 checks from approximately nine different individuals and businesses. |
| 6/26/2017 | $120,714.24 | Wire transfer from Daniel Zhu's East West Bank account #XX0576, funded by approximately 24 checks from approximately nine different individuals and businesses. |

a.     *Financing Model.* The balance of the purchase price, $121,500.00, was financed through a two-year, 10.5% interest-only loan from "hard-money" lender Bruce J. Warren, Trustee of the Bruce J. Warren 2002 Revocable Trust, through PB Financial Group Corporation. ZHU paid $5,790.03 in fees and prepaid interest to obtain this loan.

65. *Realtor.* Heidi Phong was the realtor for this transaction and earned $7,290.00 from the sale. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

66. *Power Usage.* Power records from PG&E establish that this home is likely being used as a marijuana grow facility. The power records identified Jinshun Zhu as the subscriber to electrical service at this property beginning July 12, 2017 to the present. For the three months prior to the home being purchased for a suspected marijuana cultivation, the home averaged approximately 693 KWH per month. By contrast, the following monthly power records for this home since it was purchased on or about June 28, 2017 illustrate a significant and sustained increase in power use, consistent with an indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Jul-2017: | 205 KWH |
| b. | Aug-2017: | 5,951 KWH |
| c. | Sep-2017: | 9,905 KWH |
| d. | Oct-2017: | 10,177 KWH |
| e. | Nov-2017: | 8,919 KWH |
| f. | Dec-2017: | 9,078 KWH |
| g. | Jan-2018: | 6,503 KWH |
| h. | Feb-2018: | 8,177 KWH |

67. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. PG&E records reflected that the payments made on the electric bills for Target Property 2 were most frequently made with money orders. Based on my training experience, I am aware that marijuana trafficking and growing is a cash intensive business and that it is common for marijuana traffickers and growers to pay for utilities such as power with money orders and/or cash.

68. *Surveillance.* I conducted surveillance on this house on January 30, 2018. During surveillance, I observed that the property was fenced with a black security gate blocking the drive way up to the residence and that there were several orange and black "Private Property" signs posted at the entrance to the property. I also observed that the blinds to the windows were closed. I noted that the house was located on the top of a hill and that there were multiple outbuildings located next to the house. On March 12, 2018, additional surveillance was conducted by DEA on this property. During the March 12, 2018 surveillance, a black Toyota Camry with California license plate 7WFJ055, registered to Daniel Jing Zhu, was observed leaving Target Property 2 and driving to Target Property 3.

### Target Property 3 – 19460 Fiddletown Road, Fiddletown, California

69. Target Property 3 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

70. *Escrow and Loan Files Show Same Pattern of Financing.* Daniel Zhu, the same purchaser of Target Properties 1 and 2, purchased Target Property 3 (19460 Fiddletown Road,

Fiddletown, California), on or about October 16, 2015, for $366,200. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 9/21/2015 | $10,000.00 | Personal check from Daniel Zhu's East West Bank account #XX0576, funded by three checks from two different individuals and $2,000.00 in cash deposited to the account. |
| 10/13/2015 | $20,000.00 | Wire transfer from Daniel Zhu's East West Bank account #XX0576, funded by numerous checks from numerous individuals. |
| 10/15/2015 | $132,485.49 | Wire transfer from Daniel Zhu's East West Bank account #XX0576, funded by a wire transfer from China of $49,989.00 on 10/12/2015, and numerous checks from numerous individuals. |

        a.    *Financing Model.*   The balance of the purchase price, $219,600.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender Northern CA Mortgage Fund IX, LLC, a subsidiary of FJM Private Mortgage, LLC. Daniel Zhu paid $9,643.63 in fees and prepaid interest to obtain this loan. According to a deed of trust filed with the Amador County Recorder, this loan was refinanced with "hard-money" lender Bruce J. Warren, Trustee of the Bruce J. Warren 2002 Revocable Trust (the same "hard money" lender Daniel Zhu used to buy Target Property 2) for $233,000.00 on or about November 15, 2017.

        71.   *Realtor.*  Heidi Phong was the realtor for this transaction and earned $6,155.00 from the sale. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

        72.   *Power Usage.*  Power records from PG&E establish that this home is likely being used as a marijuana grow facility. The power records identified the owner, Daniel Zhu, as the subscriber to electrical service at this property beginning October 26, 2015 to the present. For the two years and one month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 847 kilowatt hours (KWH) per month. By contrast, the following information for this home since it was purchased on or about 10/26/2015 illustrate significant and sustained increase in power, consistent with indoor marijuana cultivation.

    Excluding the first 4-day billing, for the last two months of 2015, the monthly power use averaged approximately 5,095 per month, which is indicative of a marijuana grow. In 2016, the monthly power use averaged 8,438 KWM, which is further indicative of a marijuana grow. The monthly figures for 2017 forward, which indicate that marijuana cultivation continues, are as follows:

       a.     Jan-2017:     9,514 KWH
       b.     Feb-2017:     8,678 KWH
       c.     Mar-2017:    9,243 KWH
       d.     Apr-2017:     9,894 KWH
       e.     May-2017:   11,155 KWH

| f. | Jun-2017: | 10,150 KWH |
| g. | Jul-2017: | 11,290 KWH |
| h. | Aug-2017: | 5,391 KWH |
| i. | Sep-2017: | 420 KWH |
| j. | Oct-2017: | 188 KWH |
| k. | Nov-2017: | 614 KWH |
| l. | Dec-2017: | 5,755 KWH |
| m. | Jan-2018: | 8,350 KWH |
| n. | Feb-2018: | 5,326 KWH |

73.   Based on the fact that Daniel Zhu had to pay off or refinance the two-year loan he received from Northern CA Mortgage Fund IX, LLC in approximately October 2017, there is good reason to believe that the decrease in the billings above for September through November were the result of Daniel Zhu having to remove the marijuana grow from the home for an appraisal for the refinance of the property.

74.   *Surveillance.* I conducted surveillance on this house on January 30, 2018. During surveillance, I observed a black security fence blocking the drive up to the residence and the same type of orange and black "Private Property" sign observed at Target Property 2. On March 12, 2018, additional surveillance was conducted by DEA on this property. During the March 12, 2018 surveillance, a black Toyota Camry with California license plate 7WFJ055, registered to Daniel Jing Zhu, was observed leaving Target Property 2 and driving over to Target Property 3.

### Target Property 4 – 2033 Bastona Drive, Elk Grove, California

75.   Target Property 4 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

76.   *Escrow and Loan Files Show Same Pattern of Financing.* Lai N. Gong and Min Hui Jiang, the buyers of Target Property 4 (2033 Bastona Drive, Elk Grove, California), purchased the property as a residential rental for $360,000.00 cash with no financing on or about October 7, 2016. Deposits to escrow consisted of the following:

| Date | Amount | Description |
|------|--------|-------------|
| 9/23/2016 | $36,000.00 | Wire transfer from Lai N. Gong's Bank of America account #XX0962, funded mainly by two deposits totaling $42,600.00 ($22,600.00 on August 29, 2016 and $20,000.00 on August 30, 2016), which are pending further identification. |
| 10/6/2016 | $152,000.00 | Wire transfer from Min H. Jiang's Santander Bank account #XX8356, funded entirely by three wire transfers from China ($49,985 on September 20, 2016, $49,989 on September 22, 2016 and $49,989 also on September 22, 2016) and $2,160.00 in cash and money orders. |
| 10/6/2016 | $10,000.00 | Wire transfer from Min H. Jiang's Bank of America account #XX5962, funded by two deposits into the account that are pending identification. |

23

| 10/7/2016 | $168,500.00 | Wire transfer from Lai N. Gong's Bank of America account #XX0962, funded mainly by two deposits into the account totaling $170,000.00 that are pending identification. |
|---|---|---|

77. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Xing Jiang as the subscriber to electrical service at this property from October 7, 2016 through August 22, 2017. Effective August 23, 2017, the subscriber was switched to Yiguang Chen. For the six-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 246 KWH per month. By contrast, the following monthly figures for this home since it was purchased on or about July 29, 2016, illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

|  |  |  |
|---|---|---|
| a. | Oct-2016: | 45 KWH (19 days) |
| b. | Nov-2016: | 9,770 KWH |
| c. | Dec-2016: | 17,063 KWH |
| d. | Jan-2017: | 14,813 KWH |
| e. | Feb-2017: | 13,062 KWH |
| f. | Mar-2017: | 12,995 KWH |
| g. | Apr-2017: | 14,918 KWH |
| h. | May-2017: | 13,809 KWH |
| i. | Jun-2017: | 12,499 KWH |
| j. | Jul-2017: | 13,023 KWH |
| k. | Aug-2017: | 10,880 KWH |
| l. | Sep-2017: | 17,336 KWH – (Subscriber changed) |
| m. | Oct-2017: | 12,946 KWH |
| n. | Nov-2017: | 13,435 KWH |
| o. | Dec-2017: | 13,854 KWH |
| p. | Jan-2018: | 16,569 KWH |
| q. | Feb-2018: | 11,240 KWH |

78. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 4 were most frequently made in cash or money orders in the SMUD lobby, or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

79. *Surveillance.* I conducted surveillance on this house on January 17, 2018. I observed that all of the blinds and shades to the windows of the house were closed and that there was a security camera installed above the garage. I also observed a "beware of dog" sign posted on the fence. Additionally, surveillance was conducted on this house on March 7, 2018, by DEA. The surveillance agent observed that the window blinds were closed and that one of the upstairs windows appeared to have a light brown board covering the window.

24

80. *Other Facts Indicating Probable Cause.*  In addition to being a co-purchaser of Target Property 4, Min Hui Jiang also purchased Target Property 5 (8613 Orison Court, Elk Grove, California), likely for the purpose of growing marijuana.

## Target Property 5 – 8613 Orison Court, Elk Grove, California

81.  Target Property 5 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

82.  *Escrow and Loan Files Show Same Pattern of Financing.*  Min Hui Jiang, the buyer of Target Property 5 (8613 Orison Court, Elk Grove, California), purchased the property as a residential rental for $375,000.00, on or about May 10, 2016.  The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
| --- | --- | --- |
| 4/26/2016 | $10,000.00 | Wire transfer from Zijin Chen's Bank of America account #XX0975, funded by wire transfers from China into the account on 2/16/2016 ($49,942.06, denoted "payment for tour") and 4/7/2016 ($49,985.00, denoted "living fee"). |
| 5/9/2016 | $70,000.00 | Wire transfer from Zijin Chen's Bank of America account #XX0975, funded by wire transfers from China into the account on 2/16/2016 ($49,942.06, denoted "payment for tour") and 4/7/2016 ($49,985.00, denoted "living fee"). |
| 5/9/2016 | $80,263.53 | Wire transfer from Min Hui Jiang's's Bank of America account#XX5962 funded by a $50,000.00 counter credit and other deposits that are pending identification. |

83.  *Financing Model.*  The balance of the purchase price, $225,000.00, was financed through a two-year, 8.9% interest-only loan from "hard-money" lender Lone Oak Fund, LLC.

84.  *Realtor.*  The realtor who represented Min Hui Jiang for this home purchase was Tony Dong.

85.  *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified Wen H. Zhu as the subscriber to electrical service at this property from 5/13/2016 to the present.  For the six-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 318 KWH per month.  By contrast, from 5/13/2016 through 12/21/2016, the monthly average after Min Hui Jiang purchased the home was 11,194 KWH, and for 2017 and forward, the following monthly figures continue to illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

    a.     Jan-2017:     16,551 KWH

    b.     Feb-2017:     13,378 KWH

    c.     Mar-2017:     14,195 KWH

    d.     Apr-2017:     15,160 KWH

    e.     May-2017:     13,516 KWH

| f. | Jun-2017: | 12,893 KWH |
|----|-----------|------------|
| g. | Jul-2017: | 13,836 KWH |
| h. | Aug-2017: | 13,708 KWH |
| i. | Sep-2017: | 14,307 KWH |
| j. | Oct-2017: | 14,470 KWH |
| k. | Nov-2017: | 14,262 KWH |
| l. | Dec-2017: | 15,519 KWH |
| m. | Jan-2018: | 16,979 KWH |
| n. | Feb-2018: | 14,793 KWH |

86. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 5 were most frequently made in cash or postal money orders in the SMUD lobby, which is consistent with other homes where investigators have found marijuana growing.

87. *Surveillance.* On January 17, 2018, DEA agents conducted surveillance on Target Property 5. During surveillance, it was observed that the blinds and shades to the windows were closed and that there was a security door installed on the front door. Additional surveillance was conducted on this house on March 5, 2018. During this surveillance, two video cameras were observed at the front of the property, with one installed above the garage area and the other installed above the porch area. It was also noted that the exterior lights were on and the blinds were closed.

88. *Telephone Activity.* According to SMUD records, the telephone number for Wen H. Zhu, the current SMUD subscriber at this address, is (917) 981-0128. Based on toll analysis for telephone number (917) 981-0128, I identified calls to telephone number (917) 288-7381, a telephone number, based on SMUD records, for Yu Zheng, the SMUD subscriber to 6439 Valley Hi Drive, Sacramento, California (Target Property 22, described below).

### Target Property 6 – 4960 Francesca Street, Elk Grove, California

89. Target Property 6 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

90. *Escrow and Loan Files Show Same Pattern of Financing.* Jinquan Li, the buyer of Target Property 6 (4960 Francesca Street, Elk Grove, California), purchased the property as a residential rental for $317,000.00 on or about March 3, 2016. On February 26, 2016, Jinquan Li put $5,000.00 down as an earnest money deposit through East West Bank cashier's check #614004594. Subsequently, Li deposited $143,998.83 by wire transfer from his JP Morgan Chase Bank account #XX2677, funded mainly by a deposit made to the account on February 29, 2016 in the amount of $155,241.65 that is pending identification. This brought the down payment to approximately 50% of the purchase price.

91. *Financing Model.* The balance of the purchase price, $180,000.00, was financed through a three-year 8.99% loan from "hard-money" lender Bernard Horton and Lennette Horton, Trustees of the Bernard Horton Retirement Trust, through Maggio Capital, Inc. The

exact terms of this loan are pending identification.  Li paid $7,853.957 in fees and prepaid interest for this loan.

92.  *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified owner Jinquan Li as the subscriber to electrical service at this property beginning on 3/29/2016.  For the five-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 323 KWH per month.  After Jingquan Li purchased the home on March 14, 2016, the power use began to increase quickly.  For 2016 under Jingquan Li, the power use averaged 6,343 KWH per month; for 2017 forward, the power use was as follows:

|   |          |            |
|---|----------|------------|
| a. | Jan-2017: | 9,726 KWH  |
| b. | Feb-2017: | 9,798 KWH  |
| c. | Mar-2017: | 7,407 KWH  |
| d. | Apr-2017: | 8,465 KWH  |
| e. | May-2017: | 7,889 KWH  |
| f. | Jun-2017: | 8,004 KWH  |
| g. | Jul-2017: | 8,096 KWH  |
| h. | Aug-2017: | 9,976 KWH  |
| i. | Sep-2017: | 9,814 KWH  |
| j. | Oct-2017: | 9,539 KWH  |
| k. | Nov-2017: | 9,438 KWH  |
| l. | Dec-2017: | 10,056 KWH |
| m. | Jan-2018: | 9,016 KWH  |
| n. | Feb-2018: | 8,954 KWH  |

93.  *Payment for Electricity.*  In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above.  SMUD records reflected that the payments made on the electric bills for Target Property 6 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

94.  *Surveillance.*  On January 17, 2018, I conducted surveillance on Target Property 6.  During surveillance, I observed that the windows on the garage were covered blocking the view into the garage and that all of the blinds and shades in the windows of the house were closed.  I also noted that there were security doors installed on the front door and on the side garage door.  A blue Toyota Sienna van with California license plate 4TTM225 and registered to Jinquan Li was parked in the driveway.  On March 7, 2018, additional surveillance was conducted on this house by DEA.  During surveillance, the agent observed a security camera installed above the garage and the same blue Toyota Sienna van with license plate 4TTM225 parked in the driveway.  The surveillance agent also observed an unidentified Asian female watering the plants in the front yard.

## Target Property 7 – 5313 Kungsting Way, Elk Grove, California

95.   Target Property 7 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

96.   *Escrow and Loan Files Show Same Pattern of Financing.*  Fu Long Liu, the buyer of Target Property 7 (5313 Kungsting Way, Elk Grove, CA), purchased the property as a residential rental for $419,000.00 on or about 7/14/2016.  Liu put $4,000.00 down as an EMD in the form of a personal check drawn on his Wells Fargo Bank account #XX4242 on 6/16/2016.  Subsequently, Fu Long Liu wired additional funds into escrow in the amount of $156,205.35 on 7/14/2016, bringing the down payment to approximately 35% of the purchase price.  This wire was funded by approximately 29 checks from over 25 different individuals and entities, as well as a wire transfer from China in the amount of $15,000.00 on 5/31/2016.

97.   *Financing Model.*  The balance of the purchase price, $272,350.00, was financed through a three-year, 10.50% interest-only loan from "hard-money" lender Corey Fenig and Faye Fenig, Trustees of the 2008 Corey and Faye Fenig Revocable Trust, through Vantex Mortgage Group.  Liu paid $11,901.29 in fees and prepaid interest to obtain this financing.

98.   *Nominee use.*  Given the fact that almost all of the funds Fu Long Liu deposited into escrow came from other individuals and business entities, it appears that Fu Long Liu does not have much, if any, personal financial interest in the property, and probable cause therefore exists to believe he is a straw buyer.

99.   *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified Cai Dong Li as the initial subscriber to electrical service at this property beginning on July 18, 2016.  The subscriber was later switched to Junpeng Chen on January 31, 2017.  For the six-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 714 KWH per month.  By contrast, the monthly figures for this home since it was purchased on or about July 14, 2016 illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation.  It should be noted that although the power subscriber changed in January 2017, the high power consumption did not.

|     |           |                                       |
|-----|-----------|---------------------------------------|
| a.  | Jul-2016: | 160 KWH (11 days)                     |
| b.  | Aug-2016: | 6,437 KWH                             |
| c.  | Sep-2016: | 12,664 KWH                            |
| d.  | Oct-2016: | 6,324 KWH                             |
| e.  | Nov-2016: | 9,437 KWH                             |
| f.  | Dec-2016: | 9,580 KWH                             |
| g.  | Jan-2017: | 7,217 KWH – (Subscriber change)       |
| h.  | Feb-2017: | 12,259 KWH                            |
| i.  | Mar-2017: | 13,367 KWH                            |
| j.  | Apr-2017: | 13,498 KWH                            |
| k.  | May-2017: | 12,986 KWH                            |
| l.  | Jun-2017: | 13,997 KWH                            |
| m.  | Jul-2017: | 12,530 KWH                            |

| n. | Aug-2017: | 10,814 KWH |
| o. | Sep-2017: | 9,990 KWH |
| p. | Oct-2017: | 9,774 KWH |
| q. | Nov-2017: | 7,419 KWH |
| r. | Dec-2017: | 7,848 KWH |
| s. | Jan-2018: | 10,891 KWH |
| t. | Feb-2018: | 9,722 KWH |

100. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 7 were most frequently made in cash in the SMUD lobby and through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

101. *Surveillance.* On January 17, 2018, DEA agents conducted surveillance on Target Property 7. During surveillance, it was observed that blinds and shades to the windows were closed and that there were no vehicles at the residence. I conducted additional surveillance on this property on March 16, 2018. I noted that no cars were present and the window blinds were closed. I also observed that a second story window located on the side of the house was pulled open although the blind was closed. Based on my training and experience and conversations with other law enforcement officers, I am aware that it is common for marijuana growers to leave a window open as means to provide ventilation for the marijuana grow.

102. *Local Law Enforcement Action.* On March 7, 2018, Elk Grove Police detectives executed a search warrant at an apartment located at 6810 Di Lusso Drive Apartment 138, Elk Grove, California. Pursuant to the search warrant, detectives found approximately thirty-one pounds of marijuana along with packaging material and arrested Cai Dong Li—the previous subscriber for electricity at Target Property 7.

103. *Other Facts Indicating Probable Cause.* As part of the large number of checks that made up Fu Long Liu's down payment, there was a check from an entity named LI C D, INC. (Bank of America account #XX3142) which was deposited into Liu's Wells Fargo Bank account #XX4242 on May 24, 2016. During the course of the Leonard Yang investigation, a check from the same entity and account was found to have been used as part of the down payment on the purchase of 8982 Elder Creek Road, Sacramento, CA in May 2016. A federal search warrant was executed on this residence on 9/14/2016 and 524 marijuana plants were located.

104. Additional research into LI C D, INC., including a review of bank records of the corporation, reflected that the officer of the corporation is Cai Dong Li, the same individual who was the initial SMUD subscriber for Target Property 7 after it was purchased. Moreover, additional bank records and Sacramento County Recorder information indicated that Cai Dong Li purchased a home in Sacramento in November 2016 located at 9913 Jasper Court, Sacramento, CA. This property was purchased on November 21, 2016 for $444,888 and Li put

down a total of $179,791.10 on this property, funded in part by $140,000 in wires from China. Li further obtained a three-year, 10% interest-only loan from "hard-money" lender Red Tower Capital, Inc. and paid $13,473.28 in fees and prepaid interest for this loan. Based on the financing and information from SMUD (8,685 KWH monthly average), this home was likely used to cultivate marijuana. This house was listed for sale on February 20, 2018.

### Target Property 8 – 7625 Meadowstone Drive, Sacramento, California

105. Target Property 8 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

106. *Escrow and Loan Files Show Same Pattern of Financing.* Shao Yan Chen, the buyer of Target Property 8 (7625 Meadowstone Drive, Sacramento, California), purchased the property from Rong Chen as a residential rental for $180,000.00 on or about January 22, 2016. It should be noted that per public record databases, Rong Chen is a relative of Shao Yan Chen. Two deposits were made to escrow for a 40% down payment as follows:

| Date | Amount | Description |
|------|--------|-------------|
| 12/30/2015 | $63,892.29 | Wire transfer from First American Title (escrow #1718468-LX) – Seller (Li Juan Wang) proceeds from the sale of real property that is pending identification. |
| 1/21/2016 | $21,300.16 | Wire transfer from Shao Yan Chen's JP Morgan Chase Bank account #6844, mainly funded by four $5,000.00 personal checks from four different individuals. |

107. *Financing Model.* The balance of the purchase price, $108,000.00, was financed through a 2-year 10% note from FJM Private Mortgage, LLC. Shao Yan Chen paid $5,315.00 in fees and prepaid interest to obtain this loan. On the loan application she signed, Shao Yan Chen indicated she worked as a cashier manager at Tokyo Hibachi Express in Colonial Heights, VA and earned $3,500.00 per month.

108. In the spring of 2017, based on prior law enforcement actions pertaining to a number of their financed homes, FJM began contacting their borrowers to request an inspection of the property used as collateral for the loans they made. FJM indicated to law enforcement that if the owner denied the inspection, FJM would file a notice of default on the property. According to FJM records, at some point after they began requesting inspections, they made contact with the owner of 7625 Meadowview for that purpose. On July 7, 2017, FJM received a payoff demand from a representative of North American Title and responded to that demand on July 10, 2017 with the loan payoff amount.

109. According to a deed of trust filed with the Sacramento County Recorder on 9/21/2017, Shao Yan Chen refinanced the FJM loan with a loan in the amount of $116,280 from hard money lenders Louis and Bonnie Hillegass, Jr., David Katz, trustee of the David Katz Living trust (25% interest), The Susan Katz revocable trust (25% interest), and Richard L. Fahrney, trustee of the Fingal Fahrney & Clark 401k profit sharing plan, fbo Richard L. Fahrney (25% interest) through Ress Financial Corp. The fees and prepaid interest paid for this loan are pending identification, however, the financial investigation thus far has generally seen loan origination fees from "hard money" lenders of 3%, therefore it is safe to conclude this loan cost

Shao Yan Chen a minimum of $3,488. Additional fees for document preparation and credit reports, as well as prepaid interest would only increase this amount. To summarize, in lieu of having FJM inspect the property (and more than likely discover a marijuana grow), Shao Yan Chen opted to refinance the property to remove FJM's loan, at a cost of several thousand dollars.

110. *Realtor.* There was no realtor for this transaction. However, Heidi Phong's entity, Skye Investment, LLC, was paid a "Transaction Coordination Fee" of $2,500.00. Based on these facts, as well as the SMUD information provided below that shows a marijuana grow was in operation at Target Property 8 well before it was purchased by Shao Yan Chen, probable cause exists to believe this was a grower-to-grower sale.

111. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility, and has been for some time. The power records identified four different subscribers to power during the time period reviewed (June 22, 2015 through January 29, 2018. When the property was owned by Rong Chen, she was the subscriber from June 22, 2015 through August 11, 2015. The subscriber was then switched to Bo Kai Guan from August 12, 2015 through December 24, 2015. During this time period, the monthly power use, indicative of a marijuana grow, was as follows:

| | | |
|---|---|---|
| a. | Jul-2015: | 5,044 KWH |
| b. | Aug-2015: | 7,137 KWH – Subscriber change. |
| c. | Sep-2015: | 8,843 KWH |
| d. | Oct-2015: | 8,120 KWH |
| e. | Nov-2015: | 8,962 KWH |
| f. | Dec-2015: | 9,183 KWH |

After escrow closed and title transferred to Shao Yan Chen on January 22, 2016, the high power use continued unabated, with two other individuals as subscribers Yuan Q. Lin (December 28, 2015 – June 7, 2016) and Quan H. Chen (June 8, 2016 – present). It should further be noted that the subscriber switched to Yuan Q. Lin even prior to escrow closing. In 2016 under these two subscribers, the monthly power use averaged 7,398 KWH. The 2017–2018 power usage, further indicative of marijuana cultivation, was as follows:

| | | |
|---|---|---|
| g. | Jan-2017: | 10,688 KWH |
| h. | Feb-2017: | 9,308 KWH |
| i. | Mar-2017: | 8,504 KWH |
| j. | Apr-2017: | 7,279 KWH |
| k. | May-2017: | 7,916 KWH |
| l. | Jun-2017: | 6,988 KWH |
| m. | Jul-2017: | 7,470 KWH |
| n. | Aug-2017: | 2,665 KWH |
| o. | Sep-2017: | 494 KWH |
| p. | Oct-2017: | 2,696 KWH |
| q. | Nov-2017: | 6,714 KWH |
| r. | Dec-2017: | 3,424 KWH |
| s. | Jan-2018: | 3,289 KWH |

t.      Feb-2018:      2,684  KWH

112. *Payment for Electricity.*  In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above.  SMUD records reflected that the payments made on the electric bills for this home were most frequently made in cash in the SMUD lobby and through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

113. *Surveillance.*  On January 17, 2018, DEA agents conducted surveillance at Target Property 8.  During surveillance, it was observed that a security gate was installed at the front door area of the residence and that the property had a surveillance camera, motion sensor lights, and an ADT security sign in the front yard.  Several vehicles were also observed including a white Toyota Sienna with California license plate 5GAB588 registered to Yuan Lin, a black BMW with California license plate 7PNA769 registered to Yuan Q. Lin, and a Honda with California license plate 7WZA456 registered to Yuan Kai Lin.  On March 5, 2018, I conducted surveillance on this property.  I observed the black BMW with California license plate 7PNA769 parked in the driveway and noted that the green waste can was placed by the curb in front of the residence.

114. *Local Law Enforcement Action.*   On August 22, 2017, Sacramento Police Department Officer Streich attempted to conduct a marijuana inspection of the residence.  Officer Streich spoke with a licensed contractor at the scene and was informed the owner was in China.

115. *Other Facts Indicating Probable Cause.*  As indicated earlier in this affidavit, during the execution of a search warrant at 5656 Shires Way, Marysville, CA (where 449 marijuana plants were located) in March 2017, Li Juan Wang, the individual who wired $63,892.29 into escrow for the purchase of Target Property 8, was found.  Moreover, during the execution of federal search warrants related to the Xiu Ping Li investigation on 7/26/2017, Li Juan Wang was located at 8638 Bradshaw Road, Elk Grove, CA, where 932 marijuana plants were seized by law enforcement.

116. Furthermore, a review of Shao Yan Chen's Chase Bank account XX6844 revealed the receipt of several wires from China in the past few years.  With these wires and other funds deposited from numerous individuals, Shao Yan Chen invested in at least two other properties identified as 3960 Cleardale Way, Sacramento, California (hereinafter "3960 Cleardale") and 2205 Meadowview Road, Sacramento, California (hereinafter "2205 Meadowview").  Based on financial records reflecting the same purchase pattern as almost all of the homes in this investigation and SMUD records, both of these homes are suspected of being used for marijuana cultivation.  3960 Cleardale was sold on or about January 8, 2018 and is not a target property in this investigation.

### Target Property 9 – 6426 Fuego Way, Elk Grove, California

117. Target Property 9 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

118. *Escrow and Loan Files Show Same Pattern of Financing.* Yong Chen, the buyer of Target Property 9 (6426 Fuego Way, Elk Grove, CA), purchased the property as a residential rental for $385,000.00 on or about 5/19/2017. The following funds were deposited into escrow to make a 35% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 5/2/2017 | $5,000.00 | Wire transfer from Yong Chen's Bank of America account #XX0533 funded by First American International Bank (FAIB) cashier's check #0955666 in the amount of $48,000.00, deposited on 5/2/2017. The identification of the funding source(s) for this check is pending. |
| 5/18/2017 | $60,000.00 | Wire transfer from Yong Chen's Bank of America account #XX0533 funded by FAIB cashier's check #0955666 in the amount of $48,000.00, deposited on 5/2/2017 and a transfer into the account of $14,990.00 that is pending identification. |
| 5/18/2017 | $61,500.00 | Wire transfer from Yong Chen's JP Morgan Chase Bank account #XX5675, funded by two deposits totaling $41,500.00 that consisted of multiple checks from multiple individuals and a transfer from a Chase savings account that is pending further identification. |
| 5/18/2017 | $18,500.00 | Wire transfer from Yong Chen's Citibank account #XX1765, funded by four deposits totaling $18,500.00 that are pending identification. |
| 5/19/2017 | $2,600.00 | Wire transfer from Maggie Chan's Golden One Credit Union account #XX6779. The funding source of this wire is undetermined. |

119. *Financing Model.* The balance of the purchase price, $250,250.00, was financed through a three-year, 8.99% interest-only loan from "hard-money" lender Susan S. Fallant, Trustee of the Silverwood Family Trust dated 03-16-90, through Maggio Capital, Inc. Yong Chen paid $8,593.62 in fees and prepaid interest for this loan.

120. *Power Usage.* Power records from SMUD establish that this home was likely being used as a marijuana grow facility. The power records identified owner Yong Chen as the initial subscriber on the property from June 1, 2017 through November 17, 2017. Effective November 20, 2017, Min Chen became the subscriber. The most recent monthly power usage since Min Chen became the SMUD subscriber is as follows:

     a.    Nov-2017:    2,874 KWH (9 days)
     b.    Dec-2017:    10,992 KWH
     c.    Jan-2018:    10,837 KWH
     d.    Feb-2018:    7,417 KWH

121. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that

the payments made on the electric bills for Target Property 9 were most frequently made in cash or postal money orders in the SMUD lobby, which is consistent with other homes where investigators have found marijuana growing.

122. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed that all of the window blinds were closed and that there was a security door covering the front door. I also observed a sheet covering one of the front windows and noted that no vehicles were present. Additional surveillance was conducted by DEA on this property on March 7 and 8, 2018. The surveillance agent noted that the window blinds were closed, the exterior lights were on, and there were no vehicles present.

123. *Local Law Enforcement Action.* I have learned that Elk Grove Police detectives have been investigating Target Property 9 as a suspected indoor marijuana grow house since approximately July 2017. As part of the Elk Grove Police investigation, detectives have conducted extensive surveillance on this residence. In June 2017, Elk Grove Police detectives observed a light blue Toyota Sienna van with California license plate 6GEH382, registered to Fa Shou Chen at 9267 Fife Ranch Way, Elk Grove, California, pull into the garage of Target Property 9. The driver of the Toyota Sienna van was identified as Quan Lin. Based on information from Elk Grove Police, I have learned that Quan Lin was arrested in January 2018 for cultivating marijuana in a residence in Amador County, California. Additionally, On December 13, 2017, Elk Grove Police detectives executed a state search warrant at 9267 Fife Ranch Way, Elk Grove, California. Pursuant to the search warrant, detectives discovered that the house was used as a drying and processing center for marijuana. Detectives seized approximately 50 pounds of processed marijuana from 9267 Fife Ranch Way along with approximately 301 marijuana clones. From the surveillance observations made by Elk Grove Police detectives, Target Property 9 was connected to at least one individual and one other residence involved in the cultivation and processing of marijuana.

124. On March 7, 2018, Elk Grove Police detectives conducted surveillance at Target Property 9. During surveillance, detectives observed a Nissan Quest van with license plate 7YVV653, registered to Zun Jin Chen at 4713 Laguna West Way, Elk Grove, California (Target Property 18) park in the driveway of the residence. Detectives identified the driver of the Nissan Quest as possibly Guanzhuo Chen, the SMUD subscriber of Target Property 18. Additionally, detectives observed a Ford Mustang with license plate 8AJV677, registered to Jie Wang also at Target Property 18, parked in the driveway. Detectives followed the Nissan Quest from Target Property 9 to a residence located at 9543 Tarbert Drive, Elk Grove, California (Target Property 24) and observed the vehicle pull into the garage of Target Property 24. On the same date, detectives observed a Honda Odyssey van registered to Yong Chen, the owner of Target Property 9, arrive at Target Property 24, and an Asian male was seen walking up to Target Property 24 from the Honda Odyssey.

125. On or about March 20, 2018, an Elk Grove Police detective learned from SMUD that the power subscriber to Target Property 9 had switched back to Yong Chen as of March 14, 2018. SMUD also advised the detective that there had been a dramatic drop in power usage at the residence on March 14, 2018. Although the power usage dropped at this property, I

believe due to the recentness of the power drop and surveillance observations made by Elk Grove Police detectives that evidence of an indoor marijuana grow still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, and building materials used to construct an indoor marijuana grow.

### Target Property 10 – 8885 Monterey Oaks Drive, Elk Grove, California

126. Target Property 10 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

127. *Escrow and Loan Files Show Same Pattern of Financing.* Sun Chang Lin, the buyer of Target Property 10 (8885 Monterey Oaks Drive, Elk Grove, California), purchased the property as a residential rental for $396,000.00 on or about March 10, 2017. The following funds were deposited into escrow to make a 30% down payment:

| Date | Amount | Description |
| --- | --- | --- |
| 2/15/2017 | $5,000.00 | Personal check drawn on Li Qun Lin's Bank of America account #XX2076 funded by a $5,000.00 cash deposit on 2/14/2017. |
| 3/9/2017 | $127,607.57 | Wire transfer from Sun Chang Lin's Bank of America account #XX9391 funded in part by a wire transfer from China in the amount of $46,300.00, deposited to the account on 3/6/2017, as well as a transfer from a certificate of deposit in the amount of $99,960.47 that was redeemed on 3/9/2017. This CD was funded entirely by proceeds from the sale of Target Property 27 (4630 Country Scene Way, Sacramento, CA), which was sold by Sun Chang Lin in October 2016 to another suspected marijuana grower. |

128. *Financing Model.* The balance of the purchase price, $277,200.00, was financed through a three-year, 9% interest-only loan from "hard-money" lenders Nguyen Xuan Thao Le and Nguyen Xuan Hai Le, through First Hascao Financial. Lin paid $10,625.65 in fees and prepaid interest for this loan.

129. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Li Qin Chen as the subscriber at Target Property 10 (8885 Monterey Oaks Drive, Elk Grove, California) from March 13, 2017 to the present. It should be noted that Li Qin Chen is a co-account holder with Li Qun Lin on Bank of America account #XX2076, which was the source account for the $5,000.00 escrow deposit on February 15, 2017. For the seven-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 569 KWH per month. By contrast, the following monthly figures for this home since it was purchased on or about March 10, 2017, illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

a.   Mar-2017:       67 KWH (17 days)
b.   Apr-2017:       1,189 KWH

|   |   |   |   |
|---|---|---|---|
| c. | May-2017: | 8,652 | KWH |
| d. | Jun-2017: | 10,824 | KWH |
| e. | Jul-2017: | 10,479 | KWH |
| f. | Aug-2017: | 7,833 | KWH |
| g. | Sep-2017: | 8,624 | KWH |
| h. | Oct-2017: | 3,724 | KWH |
| i. | Nov-2017: | 6,561 | KWH |
| j. | Dec-2017: | 6,546 | KWH |
| k. | Jan-2018: | 7,951 | KWH |
| l. | Feb-2018: | 4,028 | KWH |

130. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 10 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

131. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed that the residence had a security door installed on the front door and on the side garage door. I also observed a white Toyota RAV4 with California license plate 7SLR042 registered to Li Qun Lin parked in the driveway. On March 5, 2018, additional surveillance was conducted on this house. During this surveillance, a Honda with California license plate 7WFH807, registered to Li Qun Lin, was parked in the driveway of the residence. The surveillance agent also noted that the window blinds were closed and that there was a Christmas wreath on the front door.

### Target Property 11 – 8061 Maybelline Way, Sacramento, California

132. Target Property 11 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

133. *Escrow and Loan Files Show Same Pattern of Financing.* Zhong Chen, the buyer of Target Property 11 (8061 Maybelline Way, Sacramento, California), purchased the property as a residential rental for $339,000.00 on or about June 14, 2017. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|---|---|---|
| 5/22/2017 | $5,000.00 | Personal check drawn on Zhong Chen's JP Morgan Chase Bank account #XX9276, funded by amounts on deposit. |
| 6/12/2017 | $55,721.07 | Wire transfer from Zhong Chen's JP Morgan Chase Bank account #XX9276, funded in part by a wire transfer from China into the account in the amount of $49,980.00 on 5/31/2017. |
| 6/12/2017 | $90,030.00 | Wire transfer from Zhong Chen's Bank of America account #XX5685, funded by cash deposits, a $20,000.00 check from another individual, a $26,000.00 transfer from another Bank of |

| | | America account (pending identification), and a wire transfer from China of $49,499.38 on 5/24/2017. |
|---|---|---|

134. *Financing Model.* The balance of the purchase price, $200,000.00, was financed through a loan from "hard-money" lender Red Tower Capital, Inc. The terms of this loan are unknown at this time as the promissory note was not included in the escrow file. Zhong Chen paid $6,895.00 in fees and prepaid interest for this financing.

135. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Yun He as the initial subscriber to electrical service at this property beginning June 20, 2017 through October 13, 2017. Effective October 16, 2017, the subscriber switched to He Zhe. For the seven-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 1,059 KWH per month. By contrast, the following monthly figures for this home after it was purchased by Zhong Chen illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

     a.    Jul-2017:       483 KWH
     b.    Aug-2017:     226 KWH
     c.    Sep-2017:   1,683 KWH
     d.    Oct-2017:   5,731 KWH – Subscriber change
     e.    Nov-2017:  12,785 KWH
     f.    Dec-2017:  12,682 KWH
     g.    Jan-2018:  14,330 KWH
     h.    Feb-2018:   8,164 KWH

136. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that a security door was installed on the front door, a "beware of dog" sign was posted on the fence and a surveillance camera was installed on the front of the residence. On March 5, 2018, I conducted additional surveillance on this house. I noted that it was trash day for the neighborhood but no trash bins were out for this property. No vehicles were observed at the property.

137. *Other Facts Indicating Probable Cause.* According to a public records database, He Zhe (the second power subscriber for 8061 Maybelline Way) is an associate of Zhong Chen. Moreover, Zhong Chen and He Zhe are both listed on the JP Morgan Chase Bank account XX9276 that partially funded the down payment on Target Property 11.

138. *Local Law Enforcement Action.* On March 6, 2018, Sacramento Police Officer Blackmon responded to Target Property 11 to conduct a marijuana inspection and met with He Zhe, who was identified as the "previous tenant." Officer Blackmon reported that there was no marijuana inside the residence, but observed signs that the house was previously utilized to grow marijuana including patched up walls, fortifications and surveillance systems. Based on my training and experience and conversations with other law enforcement officers, I am aware that indoor marijuana growers often fortify the homes where marijuana is grown with security bars, gates and doors as a means to deter thefts and robberies of the marijuana grow.

139. Based on the observations of Officer Blackmon, I believe that evidence of marijuana activity, as well as evidence of an indoor marijuana grow still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, indicia such as receipts for marijuana growing supplies and equipment and building materials used to construct an indoor marijuana grow.

**Target Property 12 – 9445 Medstead Way, Elk Grove, California**

140. Target Property 12 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

141. *Escrow and Loan Files Show Same Pattern of Financing.* Zhaowei Xie, the buyer of Target Property 12 (9445 Medstead Way, Elk Grove, California), purchased the property as a residential rental for $410,000.00 on or about May 17, 2017. The following funds were deposited into escrow to make a 30% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 4/26/2017 | $5,000.00 | Personal check drawn on Zhaowei Xie's JP Morgan Chase Bank account #XX7672, funded by amounts on deposit. |
| 5/15/2017 | $120,000.00 | Wire transfer from Zhaowei Xie's JP Morgan Chase Bank account #XX7672, funded in part by two wire transfers from China into the account totaling $86,000.00 ($45,000.00 on 5/2/2017 and $41,000.00 on 5/4/2017). |
| 5/17/2017 | $14,228.28 | Wire transfer from Zhaowei Xie's JP Morgan Chase Bank account #XX7672, funded by a $17,000.00 check from Zhaowei Xie's East West Bank account #XX3622 on 5/15/2017. This East West Bank account is pending further identification. |

142. *Financing Model.* The balance of the purchase price, $287,000.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender Red Tower Capital, Inc. Xie paid $12,307.52 in fees and prepaid interest for this loan. On the loan application he signed on May 12, 2017, Zhaowei Xie, then 25 years old, indicated he was self-employed as a landscaper. No monthly income was listed.

143. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Xue H. Jin as the subscriber to electrical service at this property after it was purchased on May 17, 2017 to the present. For the three-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 721 KWH per month. By contrast, the following monthly figures for this home after it was purchased by Zhaowei Xie illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

|     |          |                       |
|-----|----------|-----------------------|
| a.  | May 2017 | 132 KWH – (9 days)    |
| b.  | Jun-2017 | 5,445 KWH             |
| c.  | Jul-2017: | 11,085 KWH           |
| d.  | Aug-2017: | 13,885 KWH           |

38

| | | |
|---|---|---|
| e. | Sep-2017: | 13,651 KWH |
| f. | Oct-2017: | 8,651 KWH |
| g. | Nov-2017: | 11,534 KWH |
| h. | Dec-2017: | 12,198 KWH |
| i. | Jan-2018: | 12,336 KWH |
| j. | Feb-2018: | 12,313 KWH |

144. *Payment for Electricity.*  In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 12 were made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

145. *Surveillance.*  I conducted surveillance on this house on January 17, 2018.  During surveillance, I observed that all of the blinds and shades to the windows were closed and that one front window had a sheet covering the window.  I also noted that a security door was installed on the front door.  Additional surveillance was conducted by DEA on March 7, 2018. The surveillance agent observed that the window blinds were closed, the exterior lights were on and Christmas decorations were hung in various locations at the front of the house.

## Target Property 13 – 7960 Tierra Glen Way, Sacramento, California

146. Target Property 13 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

147. *Escrow and Loan Files Show Same Pattern of Financing.*  Feng Xian Chen, the original buyer of Target Property 13 (7960 Tierra Glen Way, Sacramento, CA), purchased the property as a residential rental for $265,000.00 on or about January 19, 2016.  Feng Xian Chen made a down payment of approximately $135,000, and obtained financing from FJM Private Mortgage, LLC for $130,000.

148. *The Suspicious Sale of 7960 Tierra Glen Way.*  On June 9, 2017, only approximately 15 months into a 24-month loan, Feng Xian Chen sold 7960 Tierra Glen Way to Chunguan Ni for $260,000.00.  Deposits to escrow were as follows:

| Date | Amount | Description |
|---|---|---|
| 6/7/2017 | $10,402.70 | Bank of America cashier's check #0833214469 purchased by Chunguan Ni. |
| 6/8/2017 | $950.55 | Bank of America cashier's check #0833214468 purchased by seller Feng Xian Chen. Note consecutive cashier's check numbers. |
| 6/10/2017 | $130,000.00 | Seller credit provided by Feng Xian Chen. |

149. *Financing Model.*  The balance of the purchase price, $130,000.00, was financed through a one-year, 10% interest-only loan from "hard-money" lender First Life, LLC through First Hasaca Financial.  Ni paid $6,630.41 in fees and prepaid interest for this loan.

150. *Realtor.* There was no realtor involved in this transaction. The above evidence, in conjunction with an analysis of the SMUD billings for this property shown below, provide strong reason to believe that this sale was done so that FJM Private Mortgage, LLC could be paid off and Feng Xian Chen would not have to have the lender inspect the property, thereby allowing the cultivation of marijuana to continue.

151. *Power Usage.* Power records from SMUD, covering the period November 18, 2016 through February 2018 establish that this home is likely being used as a marijuana grow facility. The power records further show that despite the property changing hands and the subscribers changing, the high power use did not change. SMUD records reflect that former owner Feng Xian Chen was the subscriber for power at 7960 Tierra Glen Way from January 4, 2016 through June 8, 2017. The records further show that current owner Chunguan Ni is the subscriber from June 9, 2017 to the present, with no break in service. The monthly power usage reflects sustained high power use, and is 1) probative evidence of the bogus sale of the property outlined above and 2) consistent with indoor marijuana cultivation:

| | | | |
|---|---|---|---|
| a. | Dec-2016: | 8,779 KWH | |
| b. | Jan-2017: | 11,662 KWH | |
| c. | Feb-2017: | 10,352 KWH | |
| d. | Mar-2017: | 11,463 KWH | |
| e. | Apr-2017: | 10,129 KWH | |
| f. | May-2017: | 11,113 KWH | |
| g. | Jun-2017: | 11,014 KWH | (16 days– Feng X. Chen; 14 days – Chunguan Ni) |
| h. | Jul-2017: | 12,247 KWH | |
| i. | Aug-2017: | 9,534 KWH | |
| j. | Sep-2017: | 10,373 KWH | |
| k. | Oct-2017: | 11,207 KWH | |
| l. | Nov-2017: | 9,517 KWH | |
| m. | Dec-2017: | 9,772 KWH | |
| n. | Jan-2018: | 11,845 KWH | |
| o. | Feb-2018: | 11,161 KWH | |

152. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 13 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

153. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that the blinds and shades to the windows were closed and that there were security bars on the windows and a security fence covering the front door area. I conducted additional surveillance on this property on March 16, 2018. I noted that no cars were present and all window blinds were closed.

**Target Property 14 – 10170 Patti Way, Elk Grove, California**

154. Target Property 14 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

155. *Escrow and Loan Files Show Same Pattern of Financing.* Jin Lin was the buyer of Target Property 14 (10170 Patti Way, Elk Grove, California), and purchased the property as a residential rental for $399,888.00 on or about February 3, 2017. Deposits to escrow, including the EMD, totaled $90,775.91 (a 20% down payment) as follows:

| Date | Amount | Description |
|------|--------|-------------|
| 1/28/2017 | $5,000.00 | Wire transfer from Jin Lin's Bank of America account #XX5925, funded by funds on deposit. |
| 2/1/2017 | $85,775.91 | Wire transfer from Jin Lin's Bank of America account #XX5925, funded in part by two wire transfers from China – ($30,000.00 on October 11, 2016 – denoted as "living fee"; and $40,000.00 on October 28, 2016). |

156. *Financing Model.* Unlike almost all other financing observed in this investigation, the loan for this home, in the amount of $319,910.40, was financed through a 30-year, fixed rate 5.125% conventional loan from Mountain West Financial. Jin Lin paid $5,227.82 in fees and prepaid interest to obtain this loan.

157. On the loan application she submitted, Jin Lin indicated that she lived at 409 Linda Lane, Madison, Tennessee and was self-employed as a "manager/owner" of Jin Wu Inc/China Wok, located in Madison, Tennessee. Lin further indicated she earned $3,117.00 per month from this employment.

158. Also contained in the escrow file was a letter from Jin Lin to the seller that read as follows:

"January 12, 2017

Dear Homeowner,
I would like to thank you for allowing us to view your home. We have been searching for a home that is within this area for quite some time now. When we saw this property, we knew that we would be able to call this home. When we drove up to your street and saw the driveway, we knew we loved it already. The neighborhood was nice and quiet. There is more than enough space for my family and we are in love with all the space! We love this home and the layout. It has a cozy feel to it that we adore. We are sure that there will be much interest in your home, but we just wanted you to know how much we loved it!! Thank you again for taking time to review our offer.
.Sincerely,

Jin Lin"

159. Based on the fact that this property was converted to a marijuana cultivation site shortly after it was purchased as shown below, as well as the fact that the property was purchased as an "investment property," this letter is misleading. Moreover, this letter is

41

strikingly similar to a letter sent by another buyer of a suspected marijuana house located at 23900 N. Bryant Road, Acampo, California, which was also handled by Heidi Phong.).

160. *Realtor.* The realtors who represented Jin Lin in this purchase were Heidi Phong and Sandie Zhong, and the Phong Brokerage received $9,997.20 from this transaction. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

161. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Qidong Li as the subscriber to electrical service at this property beginning on February 10, 2017. For the seven-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged 1,030 KWH per month. By contrast, the following monthly figures for this home after it was purchased by Jin Lin illustrate a significant and sustained increase in power, consistent with indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Feb-2017: | 2,110 KWH (20 days) |
| b. | Mar-2017: | 9,913 KWH |
| c. | Apr-2017: | 13,526 KWH |
| d. | May-2017: | 14,220 KWH |
| e. | Jun-2017: | 13,268 KWH |
| f. | Jul-2017: | 14,071 KWH |
| g. | Aug-2017: | 11,361 KWH |
| h. | Sep-2017: | 11,836 KWH |
| i. | Oct-2017: | 11,900 KWH |
| j. | Nov-2017: | 10,898 KWH |
| k. | Dec-2017: | 8,159 KWH |
| l. | Jan-2018: | 4,158 KWH |
| m. | Feb-2018: | 752 KWH |

162. Although this property experienced a significant drop in power usage in February 2018, I believe that evidence of an indoor marijuana grow still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, and building materials used to construct an indoor marijuana grow. This belief is based on the recentness of the power usage drop and a March 23, 2018 conversation I had with a SMUD representative who informed me that on March 17, 2018, the power usage dramatically increased for this property.

163. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 14 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

164. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that the blinds and shades to the windows were closed and that the front yard was not maintained. I conducted additional surveillance on this property on March 16, 2018. I noted that no vehicles were present and that the window blinds were closed.

### Target Property 15 – 8744 Vytina Drive, Elk Grove, California

165. Target Property 15 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

166. *Escrow and Loan Files Show Same Pattern of Financing.* Zhoubing Yang, the buyer of Target Property 15 (8744 Vytina Drive, Elk Grove, California), purchased the property as a residential rental for $380,000.00 on or about April 11, 2017. The following funds, some coming from an individual who was not a co-buyer of the property, were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 3/20/2017 | $5,000.00 | Wire transfer from Zhoubing Yang's PNC Bank account #XX6878, funded by account balance that was derived from ATM cash deposits and checks from multiple individuals and businesses. |
| 4/10/2017 | $67,646.61 | Wire transfer from Yang Zhong Chi's Citizens Bank account #XX8752, funded mainly by multiple checks from multiple individuals, cash deposits and a $27,000.00 transfer into the account that is pending further identification. |
| 4/11/2017 | $90,000.00 | Wire transfer from Zhoubing Yang's PNC Bank account #XX6878, funded mainly by a wire transfer from China in the amount of $49,939.44 on March 22, 2017. |

167. *Financing Model.* The balance of the purchase price, $228,000.00, was financed through a two-year, 9% interest-only loan from "hard-money" lender Granite Funding, Inc. Yang paid $6,645.00 in fees and prepaid interest for this loan. On the loan application he signed on or about March 19, 2017, Zhoubing Yang, then 26 years old, indicated he lived in a rental property located at 955 Greenfield Ave., Pittsburgh, PA, was a manager at Sushi Boat in Pittsburgh, and earned $5,200 per month.

168. *Realtor.* The realtor who represented Zhoubing Yang in this purchase was Tony Dong.

169. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Zhong Chi Yang (believed to be the same individual who deposited $67,646.61 into escrow) as the subscriber to electrical service at this property after it was purchased on April 11, 2017 to the present. For the six-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 286 KWH per month. By contrast, the following monthly figures for

this home after it was purchased by Zhoubing Yang illustrate a significant and sustained increase in power, consistent with indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Apr-2017: | 156 KWH – (11 days) |
| b. | May 2017 | 4,360 KWH |
| c. | Jun-2017 | 11,767 KWH |
| d. | Jul-2017: | 14,677 KWH |
| e. | Aug-2017: | 13,271 KWH |
| f. | Sep-2017: | 11,944 KWH |
| g. | Oct-2017: | 13,384 KWH |
| h. | Nov-2017: | 10,842 KWH |
| i. | Dec-2017: | 13,348 KWH |
| j. | Jan-2018: | 12,421 KWH |
| k. | Feb-2018: | 12,732 KWH |

170. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 15 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

171. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, a white Toyota Camry with California license plate 7YBM083 registered to Chi Yang Zhong (Zhong Chi Yang) was observed parked at the residence. On March 26, 2018, DEA agents observed no vehicles at the residence.

172. *Telephone Activity.* According to SMUD records, the telephone number for Zhong Chi Yang, the current SMUD subscriber at this address, is (412) 736-5226. Based on toll analysis for telephone number (412) 736-5226, I identified calls to telephone number (360) 616-1088, a telephone number, based on SMUD records, for Ruhzu Li, the SMUD subscriber to 9009 Fernway Court, Elk Grove, California (Target Property 23).

### Target Property 16 – 9043 Pembridge Drive, Elk Grove, California

173. Target Property 16 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

174. *Escrow and Loan Files Show Same Pattern of Financing.* Jing Sheng Jiang, the buyer of Target Property 16 (9043 Pembridge Drive, Elk Grove, California), purchased the property as a residential rental for $360,000.00 on or about March 30, 2017. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|---|---|---|
| 3/2/2017 | $5,000.00 | Wire transfer from Jing Sheng Jiang's First National Bank of Mifflintown (PA) account #XX2305, funded by amounts on deposit in the account. |

| 3/28/2017 | $30,000.00 | East West Bank Cashier's check #651006953 drawn on Jing Sheng Jiang's newly opened (March 9, 2017) account #XX0418, funded almost entirely by a wire transfer from China in the amount of $31,733.88 on March 16, 2017. |
| 3/28/2017 | $118,795.90 | Wire transfer from Jing Sheng Jiang's Bank of America account #XX0872, mainly funded by an $82,000.00 check from Lai N. Gong's Bank of America account #XX0962 deposited into the account on March 22, 2017. This $82,000.00 check was funded by several large deposits that are pending identification. |

175. *Financing Model.* The balance of the purchase price, $216,000.00, was financed through a three-year, 9% interest-only loan from "hard-money" lender Jan Horn and Maureen Horn, Trustees of the Horn Family Trust, dated July 15, 2015, through Granite Funding, Inc. Jiang paid $7,555.00 in fees and prepaid interest for this loan.

176. *Realtor.* The realtor who represented Jing Sheng Jiang in this purchase was Tony Dong.

177. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Bui Liu as the subscriber to electrical service at this property after it was purchased on 3/30/2017 to the present. For the six-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 74 KWH per month. This is a very low amount and indicates the home may have been vacant. However, the following monthly figures for this home after it was purchased by Jing Sheng Jiang illustrate a significant and sustained increase in power use, consistent with indoor marijuana cultivation:

    a.    Apr-2017:      2,601 KWH
    b.    May 2017       9,622 KWH
    c.    Jun-2017      10,129 KWH
    d.    Jul-2017:      9,994 KWH
    e.    Aug-2017:      8,726 KWH
    f.    Sep-2017:      8,777 KWH
    g.    Oct-2017:      8,732 KWH
    h.    Nov-2017:      9,211 KWH
    i.    Dec-2017:      5,657 KWH
    j.    Jan-2018:      6,433 KWH
    k.    Feb-2018:      8,719 KWH

178. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 16 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

179. *Surveillance.* DEA agents conducted surveillance on this house on January 18, 2018. During surveillance, it was observed that a security door was installed on the front door and an ADT security sign was in the front yard. The blinds to the front window also appeared to be closed but were warped; thus, allowing a partial view into the front window. Additional surveillance was conducted on this property on March 5, 2018. During this surveillance, it was observed that the lawn was overgrown and not maintained, and the garage windows appeared to be covered.

180. *Other Facts Indicating Probable Cause.* In addition to purchasing Target Property 16, Jing Sheng Jiang also invested at least $73,000.00 in the purchase of 7701 Manet Parkway, Sacramento, California, that was purchased by his believed-to-be wife, Wen Hui Lin in February 2017. Due to the similar manner in which it was purchased, as well as high power use indicative of a marijuana grow, 7701 Manet Parkway is also believed to be an indoor marijuana grow.

181. Moreover, in reviewing Jing Sheng Jiang's's FNB-Mifflintown bank account #XX2305, it was discovered that Jiang wrote a $28,000.00 check to Zijin Chen on April 28, 2017 which Zijin Chen deposited into his Bank of America account #XX0975 on May 1, 2017. In reviewing Jing Sheng Jiang's Bank of America account #XX0872, it was further learned that Jiang wrote a check from that account to Zijin Chen for $133,000.00, also on April 28, 2017, which was also deposited into Chen's Bank of America account #XX0975 on May 1, 2017. As previously described in the funding of the purchase of 8613 Orison Court, Elk Grove, California (Target Property 5), Zijin Chen was a significant investor in the purchase of this suspected marijuana cultivation site.

182. Furthermore, as indicated above, the deposit into escrow on March 28, 2017 in the amount of $118,795.90 by Jing Sheng Jiang was funded mainly by an $82,000.00 check from Lai N. Gong. Lai N. Gong is the buyer of 2033 Bastona Drive, Elk Grove, California (Target Property 4).

## Target Property 17 – 7661 Fey Way, Elk Grove, California

183. Target Property 17 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

184. *Escrow and Loan Files Show Same Pattern of Financing.* Rihui Zheng, the buyer of Target Property 17 (7661 Fey Way, Elk Grove, California), purchased the property as a residential rental for $470,000.00 on or about January 27, 2017. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|---|---|---|
| 1/4/2017 | $4,700.00 | Personal check drawn on Rihui Zheng's JP Morgan Chase Bank account #XX3860, funded by a $2,500.00 cash deposit on 12/27/16; a $9,000.00 check from Da Rong Zheng on 12/29/16; and a $5,000.00 cash deposit on 1/3/17). |

46

| 1/23/2017 | $114,237.00 | Wire transfer from Rihui Zheng's newly-opened (1/3/2017) Bank of America account #XX8058, funded entirely by $12,000.00 in cash deposits, a wire transfer from China in the amount of $49,985.00 and two teller transfers into the account totaling $61,237.00 that are pending further identification. |
| 1/23/2017 | $83,000.00 | Wire transfer from Rihui Zheng's JP Morgan Chase Bank account #XX3860, mainly funded by a transfer of $49,985.00 from another JP Morgan Chase Bank account that is pending identification (but suspected to be based on a wire transfer from China given the dollar amount), as well as several other deposits of checks and cashier's checks from multiple individuals and at least $11,000.00 in U.S. currency. |
| 1/23/2017 | $4,276.32 | Wire transfer from Rihui Zheng's JP Morgan Chase Bank account #XX3860, mainly funded by a transfer of $49,985.00 from another JP Morgan Chase Bank account that is pending identification (but suspected to be based on a wire transfer from China given the dollar amount), as well as several other deposits of checks and cashier's checks from multiple individuals and at least $11,000.00 in U.S. currency. |

185. *Financing Model.* The balance of the purchase price, $282,000.00, was financed through a three-year, 10.25% interest-only loan from "hard-money" lender Socotra Fund, LLC. Zheng paid $10,511.46 in fees and prepaid interest for this loan. On the loan application he signed on January 23, 2017, Rihui Zheng indicated he lived at 16923 Pheasant Ridge Drive, Sugar Land, Texas, worked as a chef at "Happy House" and earned $4,000.00 per month.

186. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Darong Zheng as the subscriber to electrical service at this property after it was purchased on or about January 27, 2017 to the present. A comparison with the power usage of the prior owner or tenant could not be completed as the power was very low, indicating that it was probably vacant. However, the following monthly figures for this home after it was purchased by Rihui Zheng illustrate a significant and sustained use of power, consistent with indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Feb-2017: | 7,229 KWH |
| b. | Mar-2017: | 15,750 KWH |
| c. | Apr-2017: | 17,979 KWH |
| d. | May 2017: | 11,633 KWH |
| e. | Jun-2017: | 13,939 KWH |
| f. | Jul-2017: | 19,179 KWH |
| g. | Aug-2017: | 1,573 KWH |
| h. | Sep-2017: | 142 KWH |
| i. | Oct-2017: | 4,097 KWH |
| j. | Nov-2017: | 12,436 KWH |
| k. | Dec-2017: | 13,834 KWH |
| l. | Jan-2018: | 15,646 KWH |

m.   Feb-2018:   14,994 KWH

187. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 17 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

188. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that the blinds and shades to the windows were closed. I conducted additional surveillance on this property on March 16, 2018. I noted that no cars were present and the window blinds were closed.

189. *Other Facts Indicating Probable Cause.* In reviewing Rihui Zheng's Bank of America account #XX8058, it was observed that twelve $500.00 Western Union money orders were deposited into the account on November 16, 2017. A review of these money orders revealed that their unidentified purchaser went to three different locations on the same day (November 4, 2017) and purchased four money orders at each location, in an apparent attempt to avoid providing identification, which is generally required if the purchaser exceeds $3,000.00. The structuring of transaction such as this is a common tactic of those engaged in drug trafficking.

### Target Property 18 – 4713 Laguna West Way, Elk Grove, California

190. Target Property 18 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

191. *Escrow and Loan Files Show Same Pattern of Financing.* Zun Jin Chen, the buyer of Target Property 18 (4713 Laguna West Way, Elk Grove, California, purchased the property as a residential rental for $369,000.00 on or about April 17, 2017. The following funds were deposited into escrow to make a 35% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 3/16/2017 | $3,600.00 | Wire transfer from Zun Jin Chen's Citibank account number XX9759, funded by amounts on deposit in the account. |
| 4/14/2017 | $135,781.43 | Cashier's check #314039677 drawn on Zun Jin Chen's Citibank account number XX9759, funded mainly by two wire transfers from China into the account on 3/8/2017, totaling $90,000.00. |

192. *Financing Model.* The balance of the purchase price, $239,800.00, was financed through a one-year, 9.99% interest-only loan from "hard-money" lender Northern CA Mortgage XII, LLC, a subsidiary of "hard money" lender FJM Private Mortgage, LLC. Zun Jin Chen paid $9,107.86 in fees and prepaid interest for this loan.

193. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Guanzhuo Chen as the subscriber to electrical service at this property after it was purchased on or about April 17, 2017 to the present. For the eleven month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 628 KWH per month. The following monthly figures for this home after it was purchased by Zun Jin Chen illustrates a significant use of power, consistent with indoor marijuana cultivation:

|    |           |            |
|----|-----------|------------|
| a. | May 2017: | 5,390 KWH  |
| b. | Jun-2017: | 9,401 KWH  |
| c. | Jul-2017: | 12,344 KWH |
| d. | Aug-2017: | 10,704 KWH |
| e. | Sep-2017: | 2,055 KWH  |
| f. | Oct-2017: | 6,589 KWH  |
| g. | Nov-2017: | 12,260 KWH |
| h. | Dec-2017: | 4,677 KWH  |
| i. | Jan-2018: | 9,963 KWH  |
| j. | Feb-2018: | 10,929 KWH |

194. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 18 were most frequently made in cash at the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

195. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed that all of the blinds and shades in the windows of the house were closed and that there was a vent installed on the east side of the house that did not appear to be originally part of the house. On March 7, 2018, additional surveillance was conducted on this residence by DEA. The surveillance agent observed that the lawn was overgrown, the window blinds were closed, and the exterior lights were on. The surveillance agent also noted that there was a Christmas stocking and a solicitation flyer on the front door indicating that the front door was not frequently used.

196. *Local Law Enforcement Action.* I have learned that Elk Grove Police detectives have been investigating Target Property 18 as a suspected indoor marijuana grow house since approximately July 2017. As part of the Elk Grove Police investigation into this property, detectives have conducted extensive surveillance and observed a Nissan Quest van registered to Zun Jin Chen at Target Property 18 and at other suspected marijuana grow houses including Target Properties 9 and 24.

**Target Property 19 – 3975 Deer Cross Way, Sacramento, California**

197. Target Property 19 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

198. *Escrow and Loan Files Show Same Pattern of Financing.* Dong Li , the buyer of Target Property 19 (3975 Deer Cross Way, Sacramento, California), purchased the property as a residential rental for $180,000.00 on or about May 5, 2015. The following funds were deposited into escrow to make a 50% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 4/20/2015 | $3,000.00 | Personal check drawn on Dong Li's JP Morgan Chase Bank account #XX0242, funded by amounts on deposit in the account. |
| 5/4/2015 | $100,363.11 | Wire transfer from Dong Li's JP Morgan Chase Bank account #XX0242, funded by two wire transfers into the account on 4/17/2015 ($48,280.00) and 4/21/2015 ($15,985.00), along with several other deposits that are pending identification. |

199. *Financing Model.* The balance of the purchase price, $90,000.00, was financed through a three-year, 10.25% interest-only loan from "hard-money" lenders Kasey Sarah Olin and Joseph John Ciranni through Placer Lender Services. Li paid $4,362.00 in fees and prepaid interest for this loan.

200. *Realtor.* The realtor who represented Dong Li in this purchase was Tony Dong.

201. *Power Usage.* Power records from SMUD establish that this home is likely being used as marijuana grow facility. The power records identified Huan Li as the first subscriber to electrical service at this property after it was purchased by Dong Li from May 8, 2015 through April 18, 2016. The power subscriber was then changed to owner Dong Li from May 5, 2016 through April 7, 2017. Effective April 10, 2017 through October 5, 2017, Yu Qiu was the subscriber, and then on October 6, 2016 the subscriber was switched back to owner Dong Li.

202. After Dong Li purchased Target Property 19, the power use increased substantially and is indicative of marijuana cultivation activity. Under subscriber Huan Li (May 8, 2015 – April 18, 2016), the monthly power use averaged 6,263 KWH. Under owner Dong Li (May 5, 2016 – April 7, 2016) the monthly power use averaged 6,029 KWH. Under Yu Qiu (April 10, 2017 – October 5, 2017) the monthly power use averaged 9,818 KWH. When the power was switched back to owner Dong Li for the second time, the monthly power was as follows:

        a.      Oct-2017:     4,623 KWH
        b.      Nov-2017:    9,737 KWH
        c.      Dec-2017:   10,438 KWH
        d.      Jan-2018:    9,865 KWH
        e.      Feb-2018:    9,566 KWH

203. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 19 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

204. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that that the blinds and shades to the windows were closed. I conducted additional surveillance on this property on March 5, 2018, and observed that no vehicles were present and that the recycle can was out by the curb in front of the residence.

### Target Property 20 – 5420 Acme Avenue, Sacramento, California

205. Target Property 20 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

206. *Escrow and Loan Files Show Same Pattern of Financing.* John Youmin Li, the buyer of Target Property 20 (5420 Acme Avenue, Sacramento, California), purchased the property as a residential rental for $429,000.00 on or about November 18, 2016. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 11/7/2016 | $5,000.00 | Personal check from Zutao Li's Iberia Bank account #XX8443 funded by amounts on deposit in the account which were derived from a substantial number of checks from numerous individuals and business entities. |
| 11/17/2017 | $30,000.00 | Wire transfer from Zutao Li's JP Morgan Chase Bank account #XX2633, funded by deposits that are pending identification. |
| 11/17/2016 | $158,500.00 | Wire transfer from Zutao Li's Iberia Bank account #XX8443 funded in part by two wires from China on 9/30/2016 ($44,983.20) and 11/1/2016 ($29,988.00), as well as amounts on deposit in the account which were derived from a substantial number of checks from numerous individuals and business entities. |

207. *Financing Model.* The balance of the purchase price, $246,000.00, was financed through a two-year, 9% interest-only loan from "hard-money" lenders Tamra Rose Olin and Lori Jeanne Olin, through Granite Funding, Inc. John Youmin Li paid $8,796.50 in fees and prepaid interest for this loan.

208. *Nominee use.* It is believed that Zutao Li is the father of the buyer, John Youmin Li. Given that all of the funds for the purchase of this house came through Zutao Li's accounts, it is reasonable to conclude that John Youmin Li might be a straw buyer.

209. *Realtor.*  The realtor who represented John Youmin Li in this purchase was Tony Dong.

210. *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified Jimmy Ke as the subscriber to electrical service at this property after it was purchased on or about November 18, 2016 to the present.  For the eight-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 923 KWH per month.   The following monthly figures for this home after it was purchased by John Youmin Li illustrate a significant and sustained increase in power, consistent with indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Nov 2016: | 331 KWH |
| b. | Dec-2016: | 1,398 KWH |
| c. | Jan-2017: | 2,374 KWH |
| d. | Feb-2017: | 10,740 KWH |
| e. | Mar-2017: | 15,745 KWH |
| f. | Apr-2017: | 15,510 KWH |
| g. | May 2017 | 13,666 KWH |
| h. | Jun-2017 | 18,332 KWH |
| i. | Jul-2017: | 21,998 KWH |
| j. | Aug-2017: | 20,573 KWH |
| k. | Sep-2017: | 20,262 KWH |
| l. | Oct-2017: | 17,337 KWH |
| m. | Nov-2017: | 22,018 KWH |
| n. | Dec-2017: | 8,787 KWH |
| o. | Jan-2018: | 1,147 KWH |
| p. | Feb-2018: | 1,314 KWH |

211. *Surveillance.*  I conducted surveillance on this house on February 5, 2018.  During surveillance I observed several vehicles parked at the residence including a white van with California license plate 51527A2 registered to Nai Liang Li, a black Jeep with Louisiana license plate 867AEE registered to Ai H. Chen and Jimmy Ke, and a black Honda Civic with California license plate 7RWG302 registered to Jimmy Ke or Lauren Clements.  I also noted that the property had a black security fence around the front the yard of the property.

212. On July 13, 2017, I conducted surveillance at a residence located at 8638 Bradshaw Road, Elk Grove, California.  During surveillance, I observed the same black Jeep with Louisiana license plate 867AEE and the black Honda Civic with California license plate 7RWG302 arrive at 8638 Bradshaw Road.  As previously stated in the description for Target Property 8, above, a federal search warrant was executed at 8638 Bradshaw Road, Elk Grove, California in July 2017, and 932 marijuana plants were seized by law enforcement.

213. *Other Facts Indicating Probable Cause.*  The financier of the purchase of this marijuana cultivation site, Zutao Li, has been known to investigators for some time.  In both the Leonard Yang and Xiu Ping Li investigations, an individual known as Yongjie Liu was identified as having been involved in marijuana cultivation activity with both Leonard Yang

and Xiu Ping Li, and was indicted for this activity in or about August 2017. On numerous occasions, Yongjie Liu was observed driving a blue Honda Odyssey minivan with Louisiana plate number XJS712, which was registered to both Yongjie Liu and Zutao Li. The van was further observed at several grow sites associated with Leonard Yang and Xiu Ping Li.

214. Moreover, during the Xiu Ping Li investigation, after the execution of a search warrant at 2860 Central Ave on 7/26/2017, a 2017 Ford van with California license plate 51527A2, registered to an individual identified as Nai Li, was observed at the house by a concerned citizen. The witness observed men loading items (believed to be indoor marijuana cultivation equipment) into the van. Records of the purchase of this van reflected that Zutao Li wrote a check for $3,000.00 to Tracy Honda as part of the down payment. Furthermore, on the credit application, Nai Li listed his nearest relative as Jimmy Ke (the subscriber on SMUD at 5420 Acme Avenue) with an address of "417 Cherokee Lane, Sacramento, California." This address does not exist; however, according to the Louisiana Department of Motor Vehicles, the address of 417 Cherokee Lane, Lafayette, Louisiana, comes back to Zutao Li and his son, John Youmin Li.

215. *Local Law Enforcement Action.* On December 20, 2017, the Sacramento Police Department served a building inspection warrant at Target Property 20 as the property was identified as a suspected illegal marijuana grow. The officers serving the warrant were part of the nuisance abatement section for the City of Sacramento. Pursuant to the warrant, officers observed 1,051 marijuana plants and noted that all of the bedrooms had been converted to grow rooms with marijuana plants in each room. Officers also observed ventilation systems, insulated walls, chemicals used to grow marijuana and grow lights and ballasts inside the residence. Officers counted approximately 48 lights and ballasts, 23 fans, seven filtration units and five blowers. An administrative penalty of $522,500 ($500 fine per marijuana plant exceeding six plants) was issued to the owner of Target Property 20 by the inspecting officer.

216. I believe that the drop in power for Target Property 20 is due to the December 20, 2017 administrative search action by the Sacramento Police Department. In my training and experience, observations made in this investigation and conversations with other law enforcement officers, I am aware that although the Sacramento Police Department conducts administrative inspections of suspected indoor marijuana grows, the administrative penalties do not always deter marijuana growers from continuing to grow marijuana. Additionally, the Sacramento Police Department did not report that the marijuana plants or marijuana equipment was seized from the residence; rather, it was just reported that an administrative fine was issued. As such, I believe that evidence of marijuana activity, as well as evidence of an indoor marijuana grow still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, indicia such as receipts for marijuana growing supplies and equipment and building materials used to construct an indoor marijuana grow.

### Target Property 21 – 8139 Valley Green Drive, Sacramento, California

217. Target Property 21 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

218. *Escrow and Loan Files Show Same Pattern of Financing.* Ketong Cai and Xiuqin Lin, husband and wife, purchased Target Property 21 (8139 Valley Green Drive, Sacramento, California) for $200,000.00 on or about July 24, 2015. Documents contained in the escrow file reflect that the buyers paid for the property in full as follows:

| Date | Amount | Description |
|------|--------|-------------|
| 7/15/2015 | $5,000.00 | Personal check from Ketong Cai's JP Morgan Chase Bank account #XX5960 funded by amounts on deposit in the account. |
| 7/23/2015 | $195,300.00 | Wire transfer from Xiuqing Lin's Bank of America account #XX6224. This wire was funded by several counter credits and transfers into the account that are pending further identification. |

219. Records of the Sacramento County Recorder reflect that Ketong Cai and Xiuqin Lin then refinanced the property four months later with a conventional 20-year loan for $100,000.00 on or about November 27, 2015.

220. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified owner Ketong Cai as the subscriber from July 27, 2015 to June 17, 2016. The subscriber was then switched to Erguang Lin on June 20, 2016. For the 25-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 940 KWH per month. After Ketong Kai and Xiuqin Lin purchased the property, the power use began to increase to a high level, consistent with indoor marijuana cultivation. For the eleven months under subscriber Ketong Kai, the power averaged 6,016 KWH per month. From June 2017 through February 2018, the power records under subscriber Erguang Lin illustrate a significant and sustained use of power, consistent with an indoor marijuana cultivation, as follows:

|   |   |   |
|---|---|---|
| a. | Jun-2017 | 10,719 KWH |
| b. | Jul-2017: | 11,358 KWH |
| c. | Aug-2017: | 3,912 KWH |
| d. | Sep-2017: | 6,899 KWH |
| e. | Oct-2017: | 6,078 KWH |
| f. | Nov-2017: | 6,387 KWH |
| g. | Dec-2017: | 6,959 KWH |
| h. | Jan-2018: | 9,833 KWH |
| i. | Feb-2018: | 9,267 KWH |

221. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 21 were most frequently made in the SMUD lobby with postal money orders and through pay stations (such as those found at

Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

222.*Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance it was observed that the windows were covered, security cameras were installed on the outside of the house, and a "beware of dog" sign was posted on the fence. A security gate covering the front door, security bars over the windows and an ADT security sign in the front yard were also observed. A silver Dodge Caravan bearing California license plate 7SQD701 registered to Xiu Quin Lin was parked in the driveway. On March 5, 2018, I conducted additional surveillance on this property. I again observed the silver Dodge Caravan with license plate 7SQD701, as well as a Honda Civic with California license plate 7WUX956 registered to Qin Lin parked on the driveway.

223.*Local Law Enforcement Action.* On August 14, 2017, Sacramento Police Department Officer Cannedy responded to Target Property 21 and met with Ketong Cai (Kai). Kai acknowledged to Officer Cannedy that he received an administrative letter from the Sacramento Police Department and had cleared out all of his marijuana. During an inspection of the house, Officer Cannedy observed patched holes in the walls and ceilings and equipment for packaging and growing plants in the closets indicating that marijuana was previously grown at the residence. The power use since this time indicates a likely return to such marijuana cultivation in the residence.

224.*Other Facts Indicating Probable Cause.* Ketong Kai and his wife Xiuqin Lin have purchased several properties in the Sacramento area for the purpose of cultivating marijuana. Specifically, Xiuqin Lin purchased real property located at 6734 Hedge Avenue, Sacramento, California on December 3, 2015 for $645,000, with a down payment of $322,500.00 and funding from "hard money" lender Socotra Fund, LLC (50% down payment). SMUD records reflect that for the six month prior to her purchase of 6734 Hedge Avenue, the power use averaged 1,025 KWH per month. After the purchase of this residence by Lin, the power use averaged 9,273 KWH per month. 6734 Hedge Avenue is not a target property of this investigation as it is pending sale as of February 12, 2018.

225.Moreover, Ketong Kai and his wife Xiuqin Lin purchased a residence located at 7260 Vanita Way, Sacramento, California on or about August 14, 2015 for $150,000.00. This home is presently a suspected marijuana cultivation site based on high power usage and reports by the Sacramento County Sheriff's Department of marijuana inspections conducted at 7260 Vanita Way where modifications were observed to the electrical panels and walls of the residence.

### Target Property 22 – 6439 Valley Hi Drive, Sacramento, California

226.Target Property 22 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

227.*Escrow and Loan Files Show Same Pattern of Financing.* Mou Yin Zhou, the buyer of Target Property 22 (6439 Valley Hi Drive, Sacramento, California), purchased the property

as a residential rental for $249,000.00 on or about January 12, 2016. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 12/23/2015 | $10,000.00 | Bank of America cashier's check #0807507509 from Wenhui Wang. The source of these funds is pending identification. |
| 1/8/2016 | $102,744.91 | Wire transfer from Mou Yin Zhou's Bank of America account #XX0934, funded almost entirely by a $98,500.00 transfer into the account on 12/29/2015 that is pending identification and a $5,000.00 cash deposit on 1/7/2016. |

228. *Financing Model.* The balance of the purchase price, $149,400.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender FJM Private Mortgage, LLC. Zhou paid $7,054.00 in fees and prepaid interest for this loan.

229. *Realtor.* The realtor who represented Mou You Zhou in this purchase was Heidi Phong. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

230. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Wen Hui Wang (believed to be the same individual who deposited a $10,000.00 cashier's check into escrow on December 23, 2015 as the subscriber to electrical service at this property after it was purchased on or about January 12, 2016. Wang was on the account until September 11, 2017. From September 12, 2017 to the present, the subscriber is Yu Zheng. For the four-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 460 KWH per month. In 2016 under subscriber Wen Hui Wang, the power use was approximately 8,309 KWH per month, which is consistent with marijuana cultivation. The following monthly figures for 2017 forward show a significant and sustained use of electricity, further consistent with indoor marijuana cultivation:

a.   Jan-2017:   12,806 KWH
b.   Feb-2017:   11,423 KWH
c.   Mar-2017:    6,878 KWH
d.   Apr-2017:    1,034 KWH
e.   May 2017       793 KWH
f.   Jun-2017    10,346 KWH
g.   Jul-2017:   13,726 KWH
h.   Aug-2017:   12,526 KWH
i.   Sep-2017:   14,744 KWH – Subscriber change.
j.   Oct-2017:    9,606 KWH
k.   Nov-2017:   13,566 KWH
l.   Dec-2017:   11,529 KWH
m.   Jan-2018:   12,644 KWH
n.   Feb-2018:   10,736 KWH

231. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 22 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

232. *Surveillance.* On January 17, 2018, DEA agents conducted surveillance on this Target Property 22. During surveillance, it was observed that the windows were covered and that there was a security fence around the front yard of the residence, as well as a security door on the front door. A security camera was also observed at the residence. A light colored Honda Odyssey van with California license plate 5VDT076 registered to Zheng Yu was parked in the driveway. I conducted additional surveillance on this house on March 5, 2018. I observed a silver Honda with Missouri license plate 5M4X7R registered to Ze L. Zhen and Mei Hui Chen parked on the driveway. I also observed a silver Toyota Sienna van backed up in the driveway; however, the vehicle did not have a front license plate and the rear of the vehicle was not viewable.

233. *Local Law Enforcement Action.* On April 3, 2017, Sacramento Police Officer Streich responded to Target Property 22 for a marijuana inspection and made contact with the tenant of the property who was identified as Yu Zheng. During the inspection, Officer Streich observed a lack of personal belongings in the residence and walls added in the residence. Officer Streich did not observe marijuana at the residence. Based on this information and the SMUD records shown above, it is clear that because of the Sacramento PD inspection, the subjects removed the marijuana that was growing in Target Property 22, and then resumed cultivating once the inspection was concluded. Furthermore, when the subscribers changed, the high power use continued unabated.

234. *Telephone Activity.* According to SMUD records, the telephone number for Yu Zheng, the current SMUD subscriber at this address, is (917) 288-7381. Based on toll analysis for telephone number (917) 288-7381, I identified calls to telephone number (917) 981-0128, a telephone number, based on SMUD records, for Weri H. Zhu, the SMUD subscriber to 8613 Orison Court, Elk Grove, California (Target Property 5).

### Target Property 23 – 9009 Fernway Court, Elk Grove, California

235. Target Property 23 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

236. *Escrow and Loan Files Show Same Pattern of Financing.* Bi Juan Li, the buyer of Target Property 23 (9009 Fernway Court, Elk Grove, California), purchased the property as a residential rental for $305,000.00 on or about April 26, 2016. The following funds were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 4/12/2016 | $10,000.00 | Wire transfer from Bi Juan Li's Citibank account #XX3199 funded by amounts on deposit in the account. |

| 4/25/2016 | $119,291.76 | Wire transfer from Bi Juan Li's Cathay Bank account #XX8370. The source of this amount is pending investigation. |
|---|---|---|

237. *Financing Model.* The balance of the purchase price, $183,000.00, was financed through a sixteen-month, 8.9% interest-only loan from "hard-money" lender Lone Oak Fund, LLC. Bi Juan Li paid $4,591.45 in fees and prepaid interest for this loan.

238. *Realtor.* The realtor who represented Bi Juan Li in this purchase was Tony Dong.

239. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Ruzhu Li as the subscriber to electrical service at this property after it was purchased on or about April 26, 2016 to the present. For the thirteen-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 395 KWH per month. For the eight billing cycles in 2016 under subscriber Ruzhu Li, the power use averaged 7,870 KWH per month, which is indicative of marijuana cultivation. The following monthly figures for this home for 2017 forward continue to illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

| | | |
|---|---|---|
| a. | Jan-2017: | 10,458 KWH |
| b. | Feb-2017: | 10,743 KWH |
| c. | Mar-2017: | 10,094 KWH |
| d. | Apr-2017: | 10,539 KWH |
| e. | May 2017 | 10,665 KWH |
| f. | Jun-2017 | 9,697 KWH |
| g. | Jul-2017: | 9,735 KWH |
| h. | Aug-2017: | 9,843 KWH |
| i. | Sep-2017: | 9,987 KWH |
| j. | Oct-2017: | 7,756 KWH |
| k. | Nov-2017: | 9,404 KWH |
| l. | Dec-2017: | 10,155 KWH |
| m. | Jan-2018: | 8,951 KWH |
| n. | Feb-2018: | 8,296 KWH |

240. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 23 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

241. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed a blue Toyota Sienna van with California license plate 7YYB023 registered to Wen Zhong Zhang parked on the street in front of the residence. I also observed two unknown Asian females and one unknown Asian male at the residence.. Additional surveillance was conducted on this house by DEA on March 7, 2018. The surveillance agent

observed that there was a security door installed on the front door, the window blinds were closed, and a "beware of dog" sign was posted on the fence.

242. *Telephone Activity.* According to SMUD records, the telephone number for Ruhzu Li, the current SMUD subscriber, is (360) 616-1088. Based on toll analysis for telephone number (360) 616-1088, I identified calls to telephone number (412) 736-5226, a telephone number, based on SMUD records, for Zhong Chi Yang, the SMUD subscriber to 8744 Vytina, Elk Grove, California (Target Property 15).

### Target Property 24 – 9543 Tarbert Drive, Elk Grove, California

243. Target Property 24 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

244. *Escrow and Loan Files Show Same Pattern of Financing.* Zhaohuan Wang , the buyer of Target Property 24 (9543 Tarbert Drive, Elk Grove, California), purchased the property as a residential rental for $340,000.00 on or about August 24, 2016. The following funds were deposited into escrow to make a 35% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 8/2/2016 | $10,000.00 | Wire transfer from Zhaohuan Wang's JP Morgan Chase Bank account #XX9569. Pending further identification. |
| 8/22/2016 | $20,000.00 | Wire transfer from Xueqin Wang's Citibank account #XX7478. |
| 8/22/2016 | $29,000.00 | Wire transfer from Zhaohuan Wang's JP Morgan Chase Bank account #XX9569. Pending further identification. |
| 8/22/2016 | $30,294.14 | Wire transfer from Zhaohuan Wang's Citibank account #XX7360. Pending further identification. |
| 8/22/2016 | $40,000.00 | Wire transfer from Xueqin Wang's Bank of America account #XX0543. Pending further identification. |

245. *Financing Model.* The balance of the purchase price, $221,000.00, was financed through a sixteen-month, 8.9% interest-only loan from "hard-money" lenders Bernard Horton or Lennette Horton Trustees, The Horton Family Trust dtd 9/10/1986; Wayne E. Stahmer and Linda K. Stahmer, Trustees, The Stahmer Family Trust dated June 4, 2002, and Michael Wilkie, Trustee of the Michael Wilkie Trust dated November 16, 2000, through Maggio Capital, Inc. Zhaohuan Wang paid $7,801.52 in fees and prepaid interest for this loan.

246. *Power Usage.* Power records from SMUD establish that this home was likely being used as a marijuana grow facility. The power records identified Guanrong Chen as the subscriber to electrical service at this property from 8/31/2016 to the present. According to SMUD, from 8/31/2016 through 12/31/2016, the power use averaged 7,692 KWH per month. The following monthly figures for this home for the past few months illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

    a.    Oct-2017:    10,425 KWH
    b.    Nov-2017:    13,615 KWH

|     |           |            |
| --- | --------- | ---------- |
| c.  | Dec-2017: | 12,855 KWH |
| d.  | Jan-2018: | 13,601 KWH |
| e.  | Feb-2018: | 7,417 KWH  |

247. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 24 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

248. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed that all of the blinds and shades to the windows were closed. Additional surveillance was conducted by DEA on this house on March 7, 2018. No vehicles were observed at the residence.

249. *Local Law Enforcement Action.* I have learned that Elk Grove Police detectives have been investigating Target Property 24 as a suspected indoor marijuana grow house since approximately June 2017. The investigation of Target Property 24 began after Elk Grove Police detectives learned that a residence located at 5122 Pleasantglen Way, Elk Grove, California, had been burglarized and responding officers discovered an indoor marijuana grow inside the residence. The resident of 5122 Pleasantglen Way, Xiaohui Dong, reported the burglary of the residence to police. Detectives conducted a public records check of 5122 Pleasantglen Way and determined that the owner of the residence, Zhao X. Wang, had a common New York address as the owner of Target Property 24, Zhaohuan Wang. Detectives completed a SMUD power check of Target Property 24 and based on the average monthly power usage of the house, 10,110 KWH, it was believed that Target Property 24 contained an indoor marijuana grow.

250. From June 2017 to March 2018, detectives conducted multiple surveillances on Target Property 24. During the surveillances, Detectives observed common individuals and vehicles at Target Property 24, Target Property 9 (6426 Fuego Way, Elk Grove, California) and Target Property 18 (4713 Laguna West Way, Elk Grove, California). On July 12, 2017, detectives drove by Target Property 9 (6426 Fuego Way, Elk Grove, California) and observed an orange Chevrolet HHR with California license plate 6CVF379 registered to Xiaohui Dong at Target Property 24. Xiaohui Dong was the same individual who reported the burglary at 5122 Pleasantglen Way, which was a confirmed marijuana grow.

251. Additionally, on March 7, 2018, Elk Grove Police detectives conducted surveillance at Target Property 9. During surveillance, detectives observed a Nissan Quest van with license plate 7YVV653, registered to Zun Jin Chen at 4713 Laguna West Way, Elk Grove, California (Target Property 18) park in the driveway of the residence. Detectives identified the driver of the Nissan Quest as possibly Guanzhuo Chen, the SMUD subscriber of Target Property 18, based on a comparison of Guanzhuo Chen's New York Driver's License photo. Detectives followed the Nissan Quest from Target Property 9 to Target Property 24 and

observed the vehicle pull into the garage of the residence. On the same date, detectives observed a Honda Odyssey van registered to Yong Chen, the owner of Target Property 9, arrive at Target Property 24. An Asian male was seen walking up to Target Property 24 from the Honda Odyssey.

252. On or about March 20, 2018, an Elk Grove Police detective learned from SMUD that there had been a dramatic drop in power usage at Target Property 24 on March 10, 2018. Although the power usage dropped at this property, I believe due to the recentness of the power drop and surveillance observations made by Elk Grove Police detectives that evidence of an indoor marijuana grow and/or marijuana activity still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, and building materials used to construct an indoor marijuana grow.

**Target Property 25 – 8620 Port Haywood Way, Sacramento, California**

253. Target Property 25 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

254. *Escrow and Loan Files Show Same Pattern of Financing.* Lin Lin, the buyer of Target Property 25 (8620 Port Haywood Way, Sacramento, California), purchased the property as a residential rental for $300,000.00 on or about April 12, 2016. The following funds, mainly from Yue E. Chen and her relative Zhong Chen, were deposited into escrow to make a 40% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 4/8/2016 | $56,267.66 | Wire transfer from Yue E. Chen's JP Morgan Chase Bank account #XX9812, funded mainly by a wire transfer from China into the account on 2/19/2016. |
| 4/8/2016 | $1,000.00 | Unknown Source |
| 4/8/2016 | $102,425.48 | Wire transfer from Zhong Chen's JP Morgan Chase Bank account #XX6372, funded by two wires into the account ($49,385.00 on 2/18/2016 and $49,385.00 on 3/7/2016). |
| 3/18/2016 | $9,000.00 | Unknown Source |

255. *Financing Model.* The balance of the purchase price, $180,000.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender FJM Private Mortgage, LLC. Lin Lin paid $8,295.00 in fees and prepaid interest for this loan.

256. *Use of Nominees.* Based on the fact that Lin Lin did not put much, if any, money into this purchase, there is strong reason to believe he was a straw buyer.

257. *Realtor.* The realtor who represented Lin Lin in this purchase was Heidi Phong. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

258. *The Bogus Sale of 8620 Port Haywood Way, Sacramento, CA.*  On or about August 8, 2017, six months prior to his loan from FJM being due (which he paid $8,295 to obtain), Lin Lin sold 8620 Port Haywood Way to Yue E. Chen for $300,000.00.  Deposits to escrow consisted of several small cashier's checks and one wire totaling $13,001.34.  In addition to this small amount, Lin Lin executed a seller credit to escrow in the amount of $118,000.00.  The balance of the purchase price, $180,000, was financed through a three-year, 9.4% note through Placer Lender Services.  There was no realtor relative to this transaction.

259. Based on the fact that Yue E. Chen and Zhong Chen essentially funded the entire purchase of the residence when Lin Lin bought it in April 2016, this was clearly a bogus sale. It is my belief that FJM Private Mortgage, LLC contacted Lin Lin for an inspection of the property, consistent with proceedings related to other properties described in this affidavit, and these individuals executed this bogus sale to pay off FJM Private Mortgage, avoid the inspection, and evade discovery of their marijuana cultivation operation.

260. *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified Zhong Chen as the subscriber to electrical service at this property from April 14, 2016 to the present.  For the sixteen-month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 581 KWH per month.  For the eight billing cycles in 2016 under subscriber Zhong Chen, the power use averaged 8,886 KWH per month, which is indicative of marijuana cultivation.  The following monthly figures for this home for 2017 forward continue to illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

|    |          |             |
|----|----------|-------------|
| a. | Jan-2017: | 12,612 KWH |
| b. | Feb-2017: | 12,069 KWH |
| c. | Mar-2017: | 13,375 KWH |
| d. | Apr-2017: | 12,989 KWH |
| e. | May 2017 | 13,788 KWH |
| f. | Jun-2017 | 12,859 KWH |
| g. | Jul-2017: | 11,310 KWH |
| h. | Aug-2017: | 5,845 KWH |
| i. | Sep-2017: | 7,330 KWH |
| j. | Oct-2017: | 4,677 KWH |
| k. | Nov-2017: | 5,668 KWH |
| l. | Dec-2017: | 8,517 KWH |
| m. | Jan-2018: | 7,871 KWH |
| n. | Feb-2018: | 8,729 KWH |

261. *Payment for Electricity.*  In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above.  SMUD records reflected that the payments made on the electric bills for Target Property 25 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar

locations), which is consistent with other homes where investigators have found marijuana growing.

262. *Surveillance.* DEA agents conducted surveillance on this house on January 17, 2018. During surveillance, it was observed that the windows to the residence were blacked out, there was a "beware of dog" sign, and surveillance cameras were installed at the residence. A Toyota Sienna van with California license plate 7YYB279 registered to Zhong Chen was parked in the driveway. I conducted additional surveillance on March 5, 2018, and observed a gray Honda Accord with license plate 6VKJ183 and the same Toyota Sienna with license plate 7YYB279 parked in the driveway. California Department of Motor Vehicles did not have the registered owner information available for the Honda Accord.

263. *Local Law Enforcement Action.* On August 15, 2017, Sacramento Police Officer Streich went to Target Property 25 to conduct a marijuana inspection and contacted property owner Zhong Chen. During the inspection, Officer Streich did not find any marijuana, but did observe that the residence was modified to grow marijuana indoors including with relocated walls and a gutted kitchen.

264. *Telephone Activity.* According to SMUD records, the telephone number for Zhong Chen, the current SMUD subscriber, is (917) 803-9796. Based on toll analysis for telephone number (917) 803-9796, I identified calls to telephone number (360) 616-1088, a telephone number, based on SMUD records, for Ruhzu Li, the SMUD subscriber to 9009 Fernway Court, Elk Grove, California (Target Property 23).

265. *Other Facts Indicating Probable Cause.* In addition to Target Property 25, Zhong Chen and Yue E. Chen were also involved in the purchase of 5759 Muskingham Way, Sacramento, CA (Target Property 26).

### Target Property 26 – 5759 Muskingham Way, Sacramento, California

266. Target Property 26 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

267. *Escrow and Loan Files Show Same Pattern of Financing.* Yue E. Chen, the buyer of Target Property 26 (5759 Muskingham Way, Sacramento, CA), purchased the property as a residential rental for $305,000.00 on or about January 29, 2016. The following funds, mainly from her relative Zhong Chen, were deposited into escrow to make a 50% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/2016 | $5,000.00 | Personal check from Xin Yong Weng. |
| 1/25/2016 | $153,795.02 | Wire transfer from Zhong Chen's JP Morgan Chase Bank account #XX6372, funded in part by a wire transfer from China of $50,000.00 on 1/19/2016; three consecutive checks totaling $22,000.00 (payor blank) deposited on 11/9/2015 and 11/20/2015; and a transfer from Yue E. Chen's JP Morgan Chase Bank account #XX9812 of $56,083.02. This transfer |

| | | was almost completely funded by a wire transfer from China into account #XX9812 on 1/15/2016. |
|---|---|---|

268. *Financing Model.* The balance of the purchase price, $157,500.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender FJM Private Mortgage, LLC. Yue E. Chen paid $6,682.50 in fees and prepaid interest for this loan.

269. *Realtor.* The realtor who represented Yue E. Chen in this purchase was Heidi Phong. I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

270. *The Bogus Sale of 5759 Muskingham Way, Sacramento, CA.* On or about August 8, 2017, four months prior to her loan from FJM being due (which she paid $6,682.50 to obtain), Yue E. Chen sold 5759 Muskingham Way to Li Tan Lin for $305,000.00. Deposits to escrow consisted of several small cashier's checks bought by Li Tan Lin totaling $12,500.00. In addition to this small amount, Yue E. Chen executed a seller credit to escrow in the amount of $143,000.00. The balance of the purchase price, $160,000, was financed through a three-year, 8.5% note through hard money lender James Bennett Keegan, Jr. and Diane Elaine Keegan, Trustees of the Keegan Family 1997 Trust Dated September 4, 1997. There was no realtor relative to this transaction.

271. Based on the above facts, consistent with proceedings involving other properties described herein, it is my belief that FJM Private Mortgage, LLC contacted Yue E. Chen for an inspection of the property, and these individuals then executed this bogus sale to pay off FJM Private Mortgage, avoid the inspection, and evade discovery of their marijuana cultivation operation.

272. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Li T. Lin, the straw buyer in the August 2017 bogus sale, as the subscriber to electrical service at this property from February 11, 2016 to the present. For the nine month period prior to the home being purchased for suspected marijuana cultivation, the home averaged approximately 366 KWH per month. The following monthly figures for this home for 2017 forward illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

|   |          |            |
|---|----------|------------|
| a. | Feb-2017: | 11,272 KWH |
| b. | Mar-2017: | 11,813 KWH |
| c. | Apr-2017: | 11,473 KWH |
| d. | May 2017  | 11,939 KWH |
| e. | Jun-2017  | 11,691 KWH |
| f. | Jul-2017: | 10,706 KWH |
| g. | Aug-2017: |  4,527 KWH |
| h. | Sep-2017: |  9,361 KWH |
| i. | Oct-2017: |  6,362 KWH |
| j. | Nov-2017: |  3,966 KWH |
| k. | Dec-2017: |  7,842 KWH |
| l. | Jan-2018: | 11,904 KWH |

m.   Feb-2018:   8,235 KWH

273. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. SMUD records reflected that the payments made on the electric bills for Target Property 26 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

274. *Surveillance.* On January 17, 2018, DEA agents conducted surveillance on Target Property 26. During surveillance, it was observed that a security door was installed on the front door and the windows were blacked out. Surveillance cameras were also observed at the property. A white Toyota with California license plate 7GYT770, registered to Tam Leb Lam, was parked on the driveway. On March 5, 2018, I conducted additional surveillance on this property and observed the same white Toyota parked in the driveway and noted that all of the window blinds were closed.

275. *Local Law Enforcement Action.* On August 15, 2017, Sacramento Police Officer Streich responded to Target Property 26 to conduct a marijuana inspection and contacted Li Tan Lin, the property owner. During the inspection, Officer Streich did not report observing any marijuana plants, but did observe that all of the bedrooms had been turned into what appeared to be marijuana grow rooms. In addition, Officer Streich noted that some walls had been removed and added and that there large holes in the ceilings and electrical parts everywhere indicating the past presence of marijuana grow lights and equipment.

## Target Property 27 – 4630 Country Scene Way, Sacramento, California

276. Target Property 27 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

277. *Escrow and Loan Files Show Same Pattern of Financing.* Sun Chang Lin, the buyer of Target Property 27 (4630 Country Scene Way, Sacramento, California), purchased the property as a residential rental for $225,000.00 on or about August 14, 2015. The following funds were deposited into escrow to make a 30% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 7/28/2015 | $10,000.00 | Wire transfer from Sun Chang Lin's Bank of America account #XX9391, funded by numerous small checks and transfers into the account. |
| 8/12/2015 | $100,846.51 | Wire transfer from Sun Chang Lin's Bank of America account #XX9391, funded by numerous small checks and transfers into the account, as well as a wire transfer from China into the account of $32,000.00 on 8/7/2015. This wire was from an individual identified as Yang Bao Di, possibly the same individual who is currently the subscriber for power at 4630 Country Scene Way (see below). |

278. *Financing Model.*  The balance of the purchase price, $157,500.00, was financed through a two-year, 10% interest-only loan from "hard-money" lender Lori Jeanne Olin, Trustee for the Lori J. Olin Irrevocable Trust dated April 19, 1994, through Placer Lender Services. Sun Chang Lin paid $5,618.74 in fees and prepaid interest for this loan.

279. *Realtor.*  The realtor who represented Sun Chang Lin in this purchase was Heidi Phong. Furthermore, Heidi Phong entity Skye Investment, LLC received a consulting fee of $1,875.00.  I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

280. *The Sale of 4630 Country Scene Way, Sacramento, CA.*  On or about November 2, 2016, after only having owned the home for about sixteen months, Sun Chang Lin sold 4630 Country Scene Way to Xuehong Yang for $230,000.00. On October 28, 2016, Xuehong Yang wired $103,200.00 into escrow for the down payment for 4630 Country Scene Way from her Bank of America account #XX1479. This wire was funded in part by a $49,000.00 transfer into account #XX1479 from Xuehong Yang's Bank of America savings account #XX1975 on October 28, 2016. This transfer was entirely funded by a wire from China in the amount of $49,800.00 that was deposited into account #XX1975 on September 19, 2016.

281. For this subsequent purchase, Xuehong Yang obtained financing from hard money lender Northern CA Mortgage Fund X, LLC in the form of a two-year, 10% interest-only loan of $138,000.00.

282. *Realtor.*  There were no realtors involved on either side of this subsequent transaction.  However, Heidi Phong entity Skye Investment, LLC received a "Transaction Coordination Fee of $2,500.00.  I have reviewed email messages sent to and from Heidi Phong related to this property, confirming her involvement in the transaction.

283. *Power Usage.*  Power records from SMUD establish that this home is likely being used as a marijuana grow facility.  The power records identified Yun Chen as the subscriber to electrical service at this property from 2/27/2016 (when it was owned by Sun Chang Lin) through 4/10/2017. On 4/11/2017, the subscriber changed to Baodi Yang. In 2016, the power use averaged 10,222 KWH per month, which is indicative of marijuana cultivation.  The following monthly figures for this home for 2017 forward illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

|     |           |            |
| --- | --------- | ---------- |
| a.  | Jan-2017: | 10,589 KWH |
| b.  | Feb-2017: | 11,521 KWH |
| c.  | Mar-2017: | 9,316 KWH  |
| d.  | Apr-2017: | 5,417 KWH  |
| e.  | May 2017  | 10,126 KWH |
| f.  | Jun-2017  | 12,553 KWH |
| g.  | Jul-2017: | 11,448 KWH |
| h.  | Aug-2017: | 9,924 KWH  |
| i.  | Sep-2017: | 11,623 KWH |
| j.  | Oct-2017: | 10,405 KWH |

| k. | Nov-2017: | 11,816 KWH |
| l. | Dec-2017: | 10,342 KWH |
| m. | Jan-2018: | 11,309 KWH |
| n. | Feb-2018: | 9,399 KWH |

284.     *Payment for Electricity.*   In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above.  SMUD records reflected that the payments made on the electric bills for Target Property 27 were most frequently made in cash in the SMUD lobby or through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

285. *Surveillance.*  On January 17, 2017, DEA agents conducted surveillance on this property.  During surveillance, it was observed that the house had a surveillance camera and an outer security fence surrounding the front yard of the residence, as well as an inner security fence covering the front door area of the residence. A Toyota Sienna van with California license plate 7SQD458, registered to Yun Chen, was parked in the driveway.  I also conducted surveillance on this property on March 5, 2018.  During surveillance, I observed a white Ford van with California license plate 5S70558, registered to Yun Chen, parked in the driveway.

286. *Local Law Enforcement Action.*  On April 5, 2017, Sacramento Police Department Officer Streich conducted a marijuana inspection of Target Property 27 and contacted the owner Xue Hong Yang at the residence.  Yang advised that the tenant, Yun Chen, had been growing marijuana indoors but had removed it after receiving a letter from the Sacramento Police Department.  Officer Streich observed security bars on the windows and cameras at the residence.  Officer Streich also observed patched holes in the ceiling of the residence but observed no marijuana.  It should be noted that per the SMUD records, after the Sacramento PD inspection, the cultivation of marijuana at Target Property 27 continued unabated.

287. *Other Facts Indicating Probable Cause.*  Sun Chang Lin, the original purchaser of this property, also owns 8885 Monterey Oaks Drive, Elk Grove, California (Target Property 10).  Moreover, the proceeds Sun Chang Lin received from the sale of Target Property 27 ($99,946.56 on 10/31/2016) were used to fund a portion of the down payment on Target Property 10.

### Target Property 28 – 25 Donson Court, Elk Grove, California

288. Target Property 28 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

289. *Escrow and Loan Files Show Same Pattern of Financing.*  Suki Xing H. Liang, the buyer of Target Property 28 (25 Donson Court, Elk Grove, California), purchased the property as a principal residence for $300,000.00 on or about 3/27/2017.  The following funds were deposited into escrow to make a 30% down payment:

| Date | Amount | Description |
|------|--------|-------------|
| 1/31/2017 | $3,000.00 | Personal check from (Suki) Xing H. Liang's Bank of America account #XX3084. |
| 3/21/2017 | $27,538.01 | Wire Transfer from Suki Xing H. Liang, pending further identification. |
| 3/22/2017 | $15,000.00 | Wire transfer from Su Yang Li's Citizen's Bank account, pending further identification. "Gift" letter executed by SU YAN LI (sister-in-law). |
| 3/22/2017 | $36,000.00 | Wire transfer from Cui Fang Zhen's Citizens Bank account, pending further identification. "Gift" letter executed by Cui Fang Zhen (mother-in-law). |
| 3/23/2017 | $12,000.00 | Wire transfer from Weikun Li's M&T Bank account, pending further identification. Note: Weikun Li is Suki Xing H. Liang's husband. |
| 3/23/2017 | $9,000.00 | Wire transfer from Su ShangLi's M&T Bank account, pending further identification. "Gift" letter executed by Su Shang Li (sister-in-law). |

290. *Financing Model.* The balance of the purchase price, $210,000.00, was financed through a 4.625% conventional loan from Amwest Funding Corporation.

291. *Power Usage.* Power records from SMUD establish that this home is likely being used as a marijuana grow facility. The power records identified Wei Kun Li, the husband of owner Suki Xing H. Liang, as the subscriber to electrical service at this property from March 28, 2017 to the present. The following monthly figures for this home for the past several months illustrate a significant and sustained use of electricity, consistent with indoor marijuana cultivation:

   a.   Oct-2017:      6,759 KWH
   b.   Nov-2017:      6,431 KWH
   c.   Dec-2017:      6,676 KWH
   d.   Jan-2018:      7,113 KWH
   e.   Feb-2018:      7,009 KWH

292. *Surveillance.* I conducted surveillance on this house on January 17, 2018. During surveillance, I observed that all of the window shades and blinds were closed and that the garage windows were covered with a reflective tint obstructing the view through the windows. I also observed an ADT alarm sign in the front yard and a "beware of dog" sign on the fence. On March 5, 2018, additional surveillance was conducted on this property. The surveillance agent noted that the garbage can was pulled out to the street and that the window blinds were closed.

293.    *Law Enforcement Action.* Wei Kun Li is the brother of Su Qing Li and the brother-in-law of Richard Phung, both of whom were indicted in the Eastern District of California in or about September 2015 for conspiracy to possess and distribute marijuana. On or about December 6, 2016, Wei Kun Li was encountered at the JFK Airport in New York, New York by DEA agents. After the DEA agents identified themselves to Wei Kun Li, the

agents asked for consent to search his luggage, which Wei Kun Li granted. Based on the consensual search, agents discovered $300,000 in United States currency concealed in the liner of Wei Kun Li's suitcase. When initially questioned about why Wei Kun Li was traveling with a large sum of money, Wei Kun Li told the agents that he had $40,000 in currency. It was only after agents discovered the currency in his suitcase that Wei Kun Li changed his story and stated that he was traveling with approximately $200,000. Wei Kun Li claimed that the currency was for the purchase of house in Elk Grove, California. It is believed that in addition to operating an indoor marijuana grow, Wei Kun Li also acts as a money courier as demonstrated by the $300,000 cash seizure from Wei Kun Li.

### Target Property 29 – 1165 Quail Oaks Road, Valley Springs, California

294. Target Property 29 shares many of the same common features as the confirmed indoor marijuana grows tied to the Organization described above, as follows:

295. *Escrow and Loan Files Show Same Pattern of Financing.* Shouqing Chen, the buyer of Target Property 29 (1165 Quail Oaks Road, Valley Springs, California), purchased the property as a residential rental for $462,450 as his sole and separate property on or about December 5, 2016. Chen put $10,000.00 down as an earnest money deposit through a wire transfer from his JP Morgan Chase Bank account #XX0723 on September 30, 2016. Subsequently, Chen deposited JP Morgan Chase Bank cashier's check #1149620812 in the amount of $148,947.99 into escrow on November 23, 2016, bringing his down payment to approximately 30% of the purchase price.

296. *Wire Transfers from China.* Shouqing Chen's JP Morgan Chase Bank account #XX0723 that funded the aforementioned $148,947.99 cashier's check deposited into escrow received the following wire transfer deposits from China:

| Date | Amount | Description |
|------|--------|-------------|
| 10/11/2016 | $39,980.00 | Wire transfer from Xue Xia; the purpose of the wire was noted as "Tuition Fee." |
| 10/12//2016 | $49,980.00 | Wire transfer from Song Chun Wei. |
| 10/14/2016 | $25,980.00 | Wire transfer from Xue Long Wen. |

297. *Financing Model.* The balance of the purchase price, $320,000.00, was financed through a two-year, 10.99% interest-only loan from "hard-money" lender Peggy Christensen Living Trust, through RushMyFile, Inc. Shouqing Chen paid $10,830.00 in fees for this loan.

298. *Nominee use.* Based on the numerous wire transfers from individuals in China that funded the majority of the down payment, it appears Shouqing Chen did not put much, if any, of his own money into the property, thus indicating he may be a straw buyer.

299. *Power Usage.* Power records from PG&E establish that this home was likely being used as a marijuana grow facility. The power records identified owner Shou Q. Chen as the subscriber to electrical service at this property beginning January 5, 2017. The following

monthly figures for this home since it was purchased on December 5, 2016, illustrate a significant and sustained amount of power use, consistent with indoor marijuana cultivation:

| | |
|---|---|
| Jan-2017: | 2,704 KWH |
| Feb-2017: | 11,128 KWH |
| Mar-2017: | 11,262 KWH |
| Apr-2017: | 9,408 KWH |
| May-2017: | 9,704 KWH |
| Jun-2017: | 11,537 KWH |
| Jul-2017: | 7,849 KWH |
| Aug-2017: | 11,998 KWH |
| Sep-2017: | 16,323 KWH |
| Oct-2017: | 14,383 KWH |
| Nov-2017: | 12,862 KWH |
| Dec-2017: | 5,946 KWH |
| Jan-2018: | 4,596 KWH |
| Feb-2018: | 111KWH |

300. Although this property experienced a significant drop in power usage in February 2018, I believe that evidence of an indoor marijuana grow still exists at this property, such as the following: marijuana growing equipment, modified rooms and interior structures, modified electrical systems, and building materials used to construct an indoor marijuana grow. This belief is based on the recentness of the power usage drop and surveillance observations of this property on March 5, 2018, as described below.

301. *Payment for Electricity.* In combination with the significantly higher electricity usage, the method of payment for this usage was similar to that found in the earlier investigations of confirmed marijuana grows described above. PG&E records reflected that the payments made on the electric bills for Target Property 29 were most frequently made through pay stations (such as those found at Raley's or similar locations), which is consistent with other homes where investigators have found marijuana growing.

302. *Surveillance.* I conducted surveillance on this house on March 5, 2018. During surveillance I observed building material such as plywood and "R-Tec" insulation sheets on the front porch of the residence. I also noted that a security door was installed on the front door. Based on my training and experience and conversations with other law enforcement officers, I am aware that plywood and insulation sheets are commonly used by indoor marijuana growers to build out their grows.

303. During surveillance, I observed from the street what appeared to be a trailer and outbuildings on the property. The trailer is the location at which I observed the building materials such as plywood and insulation sheets referenced above. My subsequent examination of public real estate websites indicates that Target Property 29 also has a house on it. The house is a separate structure from the trailer and outbuildings observable from the street. My review of the power records described above indicates that Target Property 29 has two separate power meters—I believe these meters would pertain to the house and trailer, respectively, although the

records do not make that distinction clear. The power records summarized above are the combined KWHs used between the two meters on Target Property 29. The same individual, Shou Q. Chen, is the named subscriber on both power accounts. The location is more fully described in Attachment A-29, incorporated herein by reference.

304. *Local Law Enforcement Action.* On November 16, 2017, the Calaveras County Sheriff's Office executed a search warrant at 3788 Dunn Valley Road, Valley Springs, CA. Pursuant to the search, 282 marijuana plants and approximately 43 pounds of processed marijuana were located at the residence. In addition, officers found two medicine bottles inside a suitcase on a desk. One was in the name of the buyer of 3788 Dunn Road, Yu Ying Cai. The other bottle was in the name of Shouqing Chen, who is the buyer of Target Property 29 (1165 Quail Oaks Road, Valley Springs, California).

305. Moreover, according to a document contained in the escrow file for the purchase of 3788 Dunn Valley Road, Valley Springs, CA, Yu Ying Cai provided information on her closest living relative. Cai listed Shou Qing Chen (Shouqing Chen), with an address of 2025 E 2nd St, Casper, Wyoming, as her closest living relative.

306. Additionally, based on information from Elk Grove PD, a silver Mercedes with Wyoming license plate 115216 was observed at a residence located at 9464 Syrah Court, Elk Grove, California on November 30, 2017. The driver of the silver Mercedes, described as an Asian male adult, was observed picking up a package from 9464 Syrah Court and placing the package into the backseat of his vehicle. Wyoming motor vehicle records for license plate 115216 showed that the vehicle was registered to Shouqing Chen, the owner of Target Property 29, at 2025 E. 2nd St., Casper, Wyoming. On or about December 20, 2017, Elk Grove PD detectives executed a search warrant at 9464 Syrah Court, Elk Grove, California, and discovered approximately 13 pounds of processed marijuana, marijuana growing equipment and packaging material, and equipment used to process the marijuana for distribution.

## VII.   SEARCH AND SEIZURE OF COMPUTERS, ELECTRONIC STORAGE DEVICES/DIGITAL DATA, AND FORENSIC ANALYSIS

307. Based on my experience, training, and conversations with other agents, I know that individuals involved with drug trafficking crimes and financial crimes, such as drug trafficking or manufacturing and money laundering, often store information regarding their activities on computers and related electronic storage devices. Accordingly, permission is sought herein to seize and search computers and other electronic devices consistent with the scope of the requested search.

308. Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devises to store or retrieve data, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data

71

to determine whether it is included in the search warrant. This sorting process renders it impractical to attempt this kind of data search on site.

309. Searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

310. Computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. I know that powering off the device may result in the loss of the volatile information. Adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. This capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. This captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

311. In order to fully retrieve data from a computer or other digital communications system, the analyst needs all magnetic storage media as well as the storage devices. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as all instruction manuals or other documentation and data security devices, and all items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software. In cases like the instant one where the evidence consists partly of image and video files, the monitor and printer are essential to show the nature and quality of the graphic images, which the system could produce. Finally, where there is probable cause to believe that the computer and its storage devises, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crimes of drug trafficking / manufacturing and money laundering in violation of federal law, they should also all be seized as such.

312. As further described in Attachment B, this warrant seeks permission to locate in the Search Location not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found in the Search Location, in whatever form they are found. One form in which the records might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

313. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as well. In particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g., cameras and printers for creating or reproducing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B is included within the scope of the warrant.

314. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular thing is not present on a drive. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

315. In order to fully retrieve data from a computer system, the review team needs all electronic storage devices as well as the computer's central processing unit (CPU). The review team may also need the computer's storage devices, the monitor, keyboard, modem, and other related hardware. As in this case where the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and quality of the graphic images that the system could produce. In addition, the review team needs all the system software (operating systems or interfaces and hard drive drivers) and any application software that may have been used to create the data (whether stored on hard drives or on external media).

316. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

317. I am familiar with and understand the implications of the Privacy Protection Act (PPA), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware of any materials to be searched and seized from the Search Location that are

protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

318. As previously mentioned, the search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work. I know that the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to data outside the scope of this warrant. A search protocol will be used to uncover evidence, instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of the search protocol, I intend to direct the review team to search any computer and computer storage medium for those items contained in Attachment B. As it concerns this particular case, I intend to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

    a. <u>Keyword Searches</u>: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I intend to use specific keywords known to be related to this case, including keywords relating to the enticement of a minor and transfer of obscene material to a minor under the age of 16. A list of keywords utilized will be maintained with the records of the forensic examination.

    b. <u>Data Carving</u>: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

    c. <u>Opening Container Files, Encrypted Volumes, Embedded Files</u>: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence sought in this warrant.

    d. <u>File Header / Extension Checks</u>: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual

observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools.

e.  Registry / Log File Checks: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to examine these files to attempt to establish the identity of any user involved in the offenses alleged in this affidavit.

f.  Metadata / Alternative Data Streams: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above as being relevant to the offenses alleged in this affidavit.

### Specific Methods for Searching Digital Evidence

319. With rare exceptions, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

320. I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media

is run through a hashing algorithm as described above, and a hash value for the entire device is generated.  Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original.  Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

321. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

322. I also hereby request judicial authorization to retain copies of all seized storage media after the review is complete. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B). Such judicial authorization is justified in this case in part because:

   a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

   b. Returning the original storage medium to its owner will not allow for the preservation of that evidence.  Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

   c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used.  That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery.  Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

   d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him.  Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

   e. Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for

evidence that is described in Attachment B but was not properly identified and segregated previously.

323. I have not attempted to acquire the sought after material through any other investigative or judicial process.

## VIII.  DATA TO BE SEIZED

324. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a.  Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

b.  Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

c.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

d.  Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.  Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files;

cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or IP addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.   All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## IX.   Conclusion

325. Based on this affidavit, I believe probable cause exists to believe that the following Target Properties contain evidence, fruits, and instrumentalities of the offenses of 21 U.S.C. §§ 841(a)(1), 846 and 856, and 18 U.S.C. §§ 1956 and 1957:

a)  7627 Masters Street, Elk Grove, California (Attachment A-1);
b)  16481 Fiddletown Road, Fiddletown, California (Attachment A-2);
c)  19460 Fiddletown Road, Fiddletown, California (Attachment A-3);
d)  2033 Bastona Drive, Elk Grove, California (Attachment A-4);
e)  8613 Orison Court, Elk Grove, California (Attachment A-5);
f)  4960 Francesca Street, Elk Grove, California (Attachment A-6);
g)  5313 Kungsting Way, Elk Grove, California (Attachment A-7);
h)  7625 Meadowstone Drive, Sacramento, California (Attachment A-8);
i)  6426 Fuego Way, Elk Grove, California (Attachment A-9);
j)  8885 Monterey Oaks Drive, Elk Grove, California (Attachment A-10);
k)  8061 Maybelline Way, Sacramento, California (Attachment A-11);
l)  9445 Medstead Way, Elk Grove, California (Attachment A-12);
m)  7960 Tierra Glen Way, Sacramento, California (Attachment A-13);
n)  10170 Patti Way, Elk Grove, California (Attachment A-14);
o)  8744 Vytina Drive, Elk Grove, California (Attachment A-15);
p)  9043 Pembridge Drive, Elk Grove, California (Attachment A-16);
q)  7661 Fey Way, Elk Grove, California (Attachment A-17);
r)  4713 Laguna West Way, Elk Grove, California (Attachment A-18);
s)  3975 Deer Cross Way, Sacramento, California (Attachment A-19);
t)  5420 Acme Avenue, Sacramento, California (Attachment A-20);
u)  8139 Valley Green Drive, Sacramento, California (Attachment A-21);
v)  6439 Valley Hi Drive, Sacramento, California (Attachment A-22);
w)  9009 Fernway Court, Elk Grove, California (Attachment A-23);
x)  9543 Tarbert Drive, Elk Grove, California (Attachment A-24);

y) 8620 Port Haywood Way, Sacramento, California (Attachment A-25);
z) 5759 Muskingham Way, Sacramento, California (Attachment A-26);
aa) 4630 Country Scene Way, Sacramento, California (Attachment A-27);
bb) 25 Donson Court, Elk Grove, California (Attachment A-28); and
cc) 1165 Quail Oaks Road, Valley Springs, California (Attachment A-29).

326. I have personally, or other law enforcement officials, observed the search warrant locations described in Attachments A-1 through A-29 and request that search warrants be issued for the items listed in Attachment B of this affidavit.

327. I request that search warrants at the locations should include all rooms, annexes, attics, spaces within walls, behind drywall, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds, and outbuildings located on the premises. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, and other storage locations within the premises in which items in Attachment B may be found.

328. I also request that search warrants at locations should include all vehicles found within the curtilage of the Target Properties be searched. Based on my training and experience, and through interaction with other experienced law enforcement officers, I know that drug traffickers commonly transport and store the evidentiary items listed in Attachment B in their vehicles.

329. I request that all bulk marijuana seized during execution of the search warrants be disposed of, except for representative samples taken in accordance with standard DEA policy and procedures.

330. I swear under penalty and perjury that the foregoing information is true and correct to the best of my knowledge, information, and belief.

**[Remainder of Page Left Intentionally Blank]**

## X.      Request to Seal

331. The United States requests that the Court order this search warrant affidavit and all accompanying filings be kept under seal until further order of the Court, with the exception that a copy of the search warrant will be left at the scene of the search. The affiant states that the criminal investigation against the operators of these Target Properties and related residential marijuana grows is continuing, and further interviews, grand jury appearances, and search warrants are contemplated. Disclosure of the contents of this affidavit could seriously impede the investigation by disclosing details of the government's investigation and evidence gathered in connection therewith. The targets and subjects of the investigation would be able to learn some of the present extent of the government's knowledge. Accordingly, the affiant requests that the Court issue an order sealing this affidavit until further order of this Court.

332. I respectfully request the issuance of search warrants authorizing any federal law enforcement officer, with the assistance of other law enforcement officers, to enter and search the structure and premises on the properties described in Attachments A-1 through A-29 for items more particularly described in Attachment B.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

Special Agent Jason Chin
DEA

Subscribed and sworn to before me on this _____ day of March, 2018.

HONORABLE Edmund F. Brennan
UNITED STATES MAGISTRATE JUDGE

Approved as to Form:

Matthew M. Yelovich
Assistant United States Attorney

80

## ATTACHMENT A-14

### 10170 Patti Way, Elk Grove, California

A residential property containing a single family residence with a peach colored exterior and white colored trim. The address numbers "10170" are affixed to the front of the house to the right of the garage. The property is located on the west side of Patti Way. The property to be searched is depicted in a recent photograph below.

The search of the aforementioned location shall include:

Any and all vehicles within the curtilage, as well as attachments, attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage, that are associated with this specific unit.



**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The items to be seized are evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses") occurring on or after January 1, 2012: 21 U.S.C. § 841(a)(1) – Manufacture, Possess with Intent to Distribute, and Distribution of Marijuana; 21 U.S.C. § 846 – Conspiracy to Manufacture and Distribute Marijuana; 21 U.S.C § 856 – Maintaining a Place for Manufacture and Distribution of Marijuana; 18 U.S.C. § 1956(a)(2)(A) - Money Laundering; 18 U.S.C. § 1956(h)- Conspiracy to Launder Money; and 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, namely:

1. United States currency or any other monetary instrument(s) worth or estimated to be worth over $2,000.

2. Marijuana in various forms, including but not limited to:  living plants, harvested plants and stalks, dried or drying plants, and processed marijuana.

3. Marijuana seeds and/or marijuana plant clones.

4. Any other controlled substances and/or contraband during service of this warrant.

5. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the possession and/or distribution of controlled substances.

6. Items evidencing the receipt of income from any source including Forms W 2, 1098 and 1099, Federal and state income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journals and ledgers, receipts, invoices, sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, stock certificates, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes payable and receivable, IOUs and other recordings of debts comprising evidence of loans and expenses, checks, passbooks and deposit receipts, check registers and checkbooks, insurance documents, money orders, cashier's checks, bank drafts, wire transfers, and money drafts.

7. Items evidencing the obtaining, transfer, and/or concealment of assets and the obtaining, transfer, concealment and/or expenditure of money to include business books and records, invoices, receipts, records of real estate or securities transactions,   escrow files, vehicle and vessel purchase records, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, loan statements, work papers, and records reflecting the purchase of assets.

8. Items tending to establish evidence of money laundering activity to include records of currency transactions, foreign and domestic financial transactions, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering. In addition, customer lists, supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when goods believed to be used in the cultivation of marijuana, were purchased, possessed, transferred, distributed, sold or concealed in whatever form (handwritten, digital, saved on computer, etc.).

9. Items relating to loans and the obtaining of funds from lending institutions or private parties including loan applications, credit reports, Verification of Deposit (VOD) forms, verification of rental status documents, correspondence to or from lending institutions, occupancy documents, verification of employment documents, accountant verification documents, and income verification documents.

10. Items evidencing any landlord tenant or leaser leaseholder relationship including rental or lease applications or agreements and drafts thereof, "walk through" documents, receipt books, rental ledgers, property descriptions, documents relating to rental income and expenses, landlord books, correspondence, credit reports, eviction records.

11. Copies of any Currency Transaction Reports (CTRs), bank notification requirements for CTRs, schedules of currency activities, money orders, cashier checks, and wire transfers.

12. Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances.

13. Items tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes, safe deposit boxes, and safes.

14. Items tending to establish the identity of persons in control of the premises being searched, to include rent receipts, utility bills, check books, bank account records, addressed envelopes, passports, residence keys, vehicle registrations, videos, exposed film and photographs.

15. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

2

16. Records showing the purchase, sale, lease, rental, installment sale of equipment that could be used to facilitate indoor marijuana cultivation; including, but not limited to, business records showing expenditures and receipts.

17. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotic trafficking activities.

18. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

19. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, and records of financial transfers which reflect the money generated from the sale of narcotics in violation of 21 U.S.C. §§ 841 and 846.

20. Mobile phones (including the contents thereof including the phone number of the device, the listing of most recent calls, the directory of names and phone numbers, saved text messages, stored emails, saved chat (including WeChat) and app logs including content, metadata that could include attribution evidence, and saved photographs and/or video clips) and other communication devices, including smart phones, which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846, and/or 843(b).

21. Surveillance equipment to help protect their marijuana dispensary operations and for counter surveillance against law enforcement, including, but not limited to, surveillance cameras and monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same, as well as any related storage media.

22. Equipment and tools used for the cultivation, storage, or processing of marijuana.

23. Books and/or magazines for growing marijuana, such as: High Times, Marijuana Growers Guides, Sinsemillia Tips, Marijuana Potency, Marijuana Botany, Marijuana, and other marijuana publications;

24. **Computers and Related Digital Evidence, As Follows:**

    a. Computers, digital devices, such as smart phones, mobile phones, or tablets, software, peripheral data storage devices, that may contain the items listed in this attachment items (records), and all other equipment/material/programs needed to review the contents of the computer (with law enforcement allowed to take the computer and related

material for off-site inspection and allowed 120 days from the day of the search to examine the content of computer and related equipment to determine whether it contains items to be seized – unless extended by order of court).

b. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

d. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow

4

others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

k.  All evidence called for in other portions of this attachment that might be stored, created, recorded, or maintained in digital format.

AO 93 (Rev. 11/13) Search and Seizure Warrant

**SEALED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 10170 Patti Way | ) Case No. |
| Elk Grove, California | ) |
| | ) |
| | ) 2:18 - SW - 0227 — EFB |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A-14, attached hereto and incorporated by reference.**


I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**


**YOU ARE COMMANDED** to execute this warrant on or before _____April 11, 2018_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 3-28-2018 at 10:30 A.M.

_____
*Judge's signature*

City and state:      Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
Signature of Judge                                              Date

### ATTACHMENT A-14

### 10170 Patti Way, Elk Grove, California

A residential property containing a single family residence with a peach colored exterior and white colored trim. The address numbers "10170" are affixed to the front of the house to the right of the garage. The property is located on the west side of Patti Way. The property to be searched is depicted in a recent photograph below.

The search of the aforementioned location shall include:

Any and all vehicles within the curtilage, as well as attachments, attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage, that are associated with this specific unit.



**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The items to be seized are evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses") occurring on or after January 1, 2012:  21 U.S.C. § 841(a)(1) – Manufacture, Possess with Intent to Distribute, and Distribution of Marijuana; 21 U.S.C. § 846 – Conspiracy to Manufacture and Distribute Marijuana; 21 U.S.C § 856 – Maintaining a Place for Manufacture and Distribution of Marijuana; 18 U.S.C. § 1956(a)(2)(A) - Money Laundering; 18 U.S.C. § 1956(h)- Conspiracy to Launder Money; and 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, namely:

1. United States currency or any other monetary instrument(s) worth or estimated to be worth over $2,000.

2. Marijuana in various forms, including but not limited to:  living plants, harvested plants and stalks, dried or drying plants, and processed marijuana.

3. Marijuana seeds and/or marijuana plant clones.

4. Any other controlled substances and/or contraband during service of this warrant.

5. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the possession and/or distribution of controlled substances.

6. Items evidencing the receipt of income from any source including Forms W 2, 1098 and 1099, Federal and state income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journals and ledgers, receipts, invoices, sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, stock certificates, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes payable and receivable, IOUs and other recordings of debts comprising evidence of loans and expenses, checks, passbooks and deposit receipts, check registers and checkbooks, insurance documents, money orders, cashier's checks, bank drafts, wire transfers, and money drafts.

7. Items evidencing the obtaining, transfer, and/or concealment of assets and the obtaining, transfer, concealment and/or expenditure of money to include business books and records, invoices, receipts, records of real estate or securities transactions,    escrow files, vehicle and vessel purchase records, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, loan statements, work papers, and records reflecting the purchase of assets.

8. Items tending to establish evidence of money laundering activity to include records of currency transactions, foreign and domestic financial transactions, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering. In addition, customer lists, supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when goods believed to be used in the cultivation of marijuana, were purchased, possessed, transferred, distributed, sold or concealed in whatever form (handwritten, digital, saved on computer, etc.).

9. Items relating to loans and the obtaining of funds from lending institutions or private parties including loan applications, credit reports, Verification of Deposit (VOD) forms, verification of rental status documents, correspondence to or from lending institutions, occupancy documents, verification of employment documents, accountant verification documents, and income verification documents.

10. Items evidencing any landlord tenant or leaser leaseholder relationship including rental or lease applications or agreements and drafts thereof, "walk through" documents, receipt books, rental ledgers, property descriptions, documents relating to rental income and expenses, landlord books, correspondence, credit reports, eviction records.

11. Copies of any Currency Transaction Reports (CTRs), bank notification requirements for CTRs, schedules of currency activities, money orders, cashier checks, and wire transfers.

12. Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances.

13. Items tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes, safe deposit boxes, and safes.

14. Items tending to establish the identity of persons in control of the premises being searched, to include rent receipts, utility bills, check books, bank account records, addressed envelopes, passports, residence keys, vehicle registrations, videos, exposed film and photographs.

15. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

2

16. Records showing the purchase, sale, lease, rental, installment sale of equipment that could be used to facilitate indoor marijuana cultivation; including, but not limited to, business records showing expenditures and receipts.

17. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotic trafficking activities.

18. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

19. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, and records of financial transfers which reflect the money generated from the sale of narcotics in violation of 21 U.S.C. §§ 841 and 846.

20. Mobile phones (including the contents thereof including the phone number of the device, the listing of most recent calls, the directory of names and phone numbers, saved text messages, stored emails, saved chat (including WeChat) and app logs including content, metadata that could include attribution evidence, and saved photographs and/or video clips) and other communication devices, including smart phones, which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846, and/or 843(b).

21. Surveillance equipment to help protect their marijuana dispensary operations and for counter surveillance against law enforcement, including, but not limited to, surveillance cameras and monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same, as well as any related storage media.

22. Equipment and tools used for the cultivation, storage, or processing of marijuana.

23. Books and/or magazines for growing marijuana, such as: High Times, Marijuana Growers Guides, Sinsemillia Tips, Marijuana Potency, Marijuana Botany, Marijuana, and other marijuana publications;

24. **Computers and Related Digital Evidence, As Follows:**

   a. Computers, digital devices, such as smart phones, mobile phones, or tablets, software, peripheral data storage devices, that may contain the items listed in this attachment items (records), and all other equipment/material/programs needed to review the contents of the computer (with law enforcement allowed to take the computer and related

material for off-site inspection and allowed 120 days from the day of the search to examine the content of computer and related equipment to determine whether it contains items to be seized – unless extended by order of court).

b.  Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

c.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

d.  Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.  Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow

4

others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

k. All evidence called for in other portions of this attachment that might be stored, created, recorded, or maintained in digital format.